JOSEPH L. BARBOUR, ADMINISTRATOR, *vs.* THE CONNECTICUT MUTUAL LIFE INSURANCE COMPANY & ANOTHER.

Hartford Dist., March T., 1891. ANDREWS, C. J., LOOMIS, SEYMOUR, TORRANCE and J. M. HALL, Js.

Where a person holding for his own benefit a policy of insurance on his life, assigns it when insolvent for the benefit of his wife and children, the transfer as a general rule is fraudulent as against his creditors, even where he had no deliberate fraudulent intention.

The reason is that he has withdrawn from his creditors an asset which would have been available for the payment of his debts.

But it becomes a matter of importance, in determining as to the fraudulent character of the transfer in a particular instance, to ascertain whether the policy had any real value as an asset for the creditors.

A debtor, residing in Canada, had at the time of his assignment in insolvency there in 1873, two policies of insurance on his own life, each for $2,500, payable to his representatives upon his death. One was a policy on which an annual premium of $206 was to be paid for ten years, and the other an ordinary life policy on which an annual premium of $129 was to be paid during life, and only two premiums had been paid on each. Each policy entitled the holder, after two payments, to a paid-up policy for a proportionate part, which was small itself and had a very small cash value. The debtor, at the first meeting of his creditors, stated to them that he held these policies, but the assignee never required the delivery of them, and none of the creditors ever took any action in the matter. A year later, in 1874, the debtor exchanged them with the insurance company for policies for the benefit of his wife. A little later the debtor was discharged in insolvency from all debts existing at the time of his assignment, and at that time, so far as appeared, no claim was outstanding against him. After the new policies were issued the debtor's sons advanced him money to pay the premiums, which were paid by them on the ten payment policy until it was paid up, and on the other until his death in 1889. In 1883 the debtor had again failed in business, and at this time was indebted to a Canada bank, the claim originating previously during that year. Upon the debtor's death the bank procured the appointment of an administrator in this state, who brought a suit against the insurance company on the old policies. Held—

1. That the assignee and creditors under the first assignment were to be regarded as having voluntarily abandoned all claim to the original policies in view of their trifling value as an available asset.

2. That if the taking out of the new policies was to be regarded as a fraud upon those creditors, yet that the plaintiff, representing a creditor whose claim originated long after that time, and after the debt-

or's discharge in insolvency, could not treat the transaction as fraudulent.

Debts contracted before a fraudulent conveyance must still exist when the subsequent debt is incurred, the holder of which seeks to avail himself of its invalidity. The subsequent creditor must stand on the equity of the former creditors.

Payment or satisfaction by a debtor of all debts existing prior to the time he makes a voluntary conveyance, repels the idea that he intended thereby to defraud his creditors.

[Argued March 7th—decided June 1st, 1891.]

ACTION to recover the amount of two policies of life insurance ; brought to the Superior Court in Hartford County. On motion of the defendant, Hannah Masters was cited in as a co-defendant, to interplead with the plaintiff as to the right to the money in question, and the case was made one of interpleader between the plaintiff and the said Hannah. The case was heard before *Fenn, J.*, who found the issue for the said Hannah, and rendered a judgment that the life insurance company should pay the money to her. The plaintiff appealed to this court.

*C. E. Perkins,* for the appellant.

1. The transfer or re-issue of the policies in 1873 was fraudulent and void as to existing creditors. Masters was then not only insolvent, but he had actually made an assignment, and all the interest he had in the policies was vested in the assignee. It is well settled that, even where an assignment has not been made, an insolvent cannot, as a voluntary gift, transfer a life insurance policy, or cause it to be re-issued payable to his wife, which amounts to the same thing, but such transfer is fraudulent and void as against existing creditors in law and in fact. *Central Bank* v. *Hume,* 128 U. S. R., 204. The decisions in this state are unanimous in holding that in such cases the law conclusively holds the conveyance fraudulent, and the actual intent of the debtor is of no importance. If his conveyance does in fact operate to defeat the rights of creditors, the law implies the intent from the act. *Beers* v. *Botsford,* 13 Conn., 154 ; *Freeman* v. *Burnham,* 36 id., 469 ; *Paulk*

v. *Cooke*, 39 id., 566, 573; *De Wolf* v. *Sprague Mfg. Co.*, 49 id., 282.; That the surrender of the policies payable to his estate, and taking out new ones exactly the same in every respect except that they were made payable to his wife, did not in any way change the rights of others, is well settled. *Chapin* v. *Fellowes*, 36 Conn., 132; *Garner* v. *Germania Life Ins Co.*, 110 N. York, 266. It cannot be doubted but that, if the assignee had seen fit, he could have successfully attacked this re-issue and had it set aside, and if he refused to do so, any existing creditor could have done so, under the decision in *Filley* v. *King*, 49 Conn., 211. It may be assumed, therefore, that this conveyance was fraudulent and void as against existing creditors, unless some other facts are found which by estoppel, or in some other way, legally prevent such a conclusion. The defendant by her answer claims that there are. (1) There is an endeavor to show that the re-issue was assented to by the creditors, but this is entirely without foundation on the facts found. All that is found is, that at the first meeting of the creditors the policies were spoken of, and "some of the creditors thought they were of little value," which is very far from showing any agreement that they should be given to Masters's wife, or any estoppel. The mere fact that the assignee did not take any steps to obtain the policies is of no importance, as was held in *Filley* v. *King*, above referred to. (2) It may be said that the policies were not then of much value, but it is a novel doctrine that the validity of the conveyance should depend on the value of the property conveyed. The premiums paid amounted to $670, and if the surrender value was only half of that it would be a material sum. If they were of sufficient value to make it an object to re-issue them instead of obtaining new ones, they would have been of value to the creditors. The re-issue, being fraudulent and void, is to be taken exactly as if it had never been made, and as if the policies remained as they were originally issued. Because Masters might have allowed these policies to lapse and taken out entirely new ones for the benefit of his wife on a new examination and for a different premium, cannot

change the law as to the ones in controversy here. Whatever he could have done, he chose not to do it. He transferred the policies to his wife because he had become insolvent. It could have been for no other purpose than to give his wife whatever benefit there was in them which properly belonged to his creditors.

2. If, then, this transfer was fraudulent and void as against existing creditors, and could have been set aside by them, the question is, whether it may be also attacked by subsequent creditors. I submit that the law is that, if a man make a voluntary conveyance of property when he is insolvent, so that the law conclusively establishes that it was made with the fraudulent intent to deprive his creditors of that property, it may be attached by any of his creditors, either then existing or subsequent. The test is, whether the conveyance was "made with intent to defraud creditors." Bump on Fraud. Conveyances, (3d ed.,) 321; 1 Am. Leading Cases, 71. In both these writers many cases are cited to sustain this view of the law. The rule is the same in Massachusetts. *Parkman* v. *Welch*, 19 Pick., 231; *Winchester* v. *Charter*, 12 Allen, 606; *Day* v. *Cooley*, 118 Mass., 524. The law is the same in New York, Maine, New Hampshire and Vermont. *Reade* v. *Livingstone*, 3 Johns Ch., 481; *King* v. *Wilcox*, 11 Paige, 589; *Shand* y. *Handley*, 71 N. York, 319; *Phœnix Bank* v. *Stafford*, 89 id., 405; *McLane* v. *Johnson*, 43 Verm., 48; *Smith* y. *Lowell*, 6 N. Hamp., 67; *Howe* v. *Ward*, 4 Maine, 195; *Davis* v. *Herrick*, 37 id., 397; *Holden* v. *Morse*, 73 id., 261. The law is the same in England and in New Brunswick, so far as the question has been discussed. *Barlow* v. *Hatfield*, 2 Kerr, 122; *Doe* v. *McCully*, 3 Allan, (N. Brunswick,) 194, 508; *Doe* v. *Trentowsky*, 5 id., 636. After a careful examination of many cases it appears to me that the following is a rule which will harmonize many of the decisions in New York and elsewhere which appear to conflict. As against existing creditors any voluntary transfer of a debtor's property is void unless it clearly appears that he has so much property and so few debts that it is clear that such gift can have no effect upon his ability

to pay his existing debts, and in such cases it is necessary to prove an actual design to defraud subsequent creditors to render the conveyance void as against them. If, however, he is at the time of making such gift actually insolvent, and still more if he has made an assignment, the law conclusively pronounces such conveyance an actual fraud on his creditors, both existing and future; on the former because it deprives them of assets which they are actually entitled to, and on the latter, because, under such circumstances, the conveyance, being stamped with actual fraud, cannot be freed from the stain, and the law will imply that the transfer was made to defeat all creditors. If the validity of this conveyance is to be determined by the decisions in England or New Brunswick, there can be no doubt as to the law, but it was treated in the court below as to be determined according to the law of this state, as there was no evidence to show what the law of New Brunswick was; and I believe that from the first the law has been held here to be as it is in Massachusetts, whenever the question has directly arisen. *Merrill* v. *Meachum*, 5 Day, 341; *Benton* v. *Jones*, 8 Conn., 185; *Paulk* v. *Cooke*, 39 id., 566; *Redfield* v. *Buck*, 35 id., 328; *Kerrigan* v. *Rautigan*, 43 id., 17; *Bassett* v. *McKenna*, 52 id., 437. So it appears that in every case in Connecticut where the question arose it has been held that a conveyance made in fraud of existing creditors, is void as to subsequent ones for that reason, while, if the claim of Mrs. Masters here is correct, every one of those cases should have been decided the other way, for in none of them was there any actual intent to defraud subsequent creditors proved. If it were necessary to hold that this reissue was intended to affect the rights of subsequent creditors, it pretty clearly appears from the fact that it was not made until January 17th, 1874, when the estate had been settled, so that on February 4th he was discharged from his debts and immediately went into business again and incurred new debts. It has been said in some cases that the principle on which the rule is founded is, that creditors are supposed to become such in reliance upon the debtor having

certain property, and that his giving it away would be a fraud on them, and that those who became creditors after the transfer could not have had such reliance. As a matter of fact few persons trust a man with any specific knowledge of what property he actually has, and if this rule was to be adopted, when a man became insolvent his assignee could only set aside the conveyance in favor of those who became creditors before it was made, which is well settled not to be the law. *Allen* v. *Rundle*, 50 Conn., 9. It is found that Masters's sons sent him money from time to time to help him pay the premiums on the new policies; but I am unable to see how this fact has any bearing on these questions. If the re-issue was valid and legal, it is certainly of no importance; and if it is held to be fraudulent and void as against creditors, it will hardly be relieved by this fact. If the conveyance was void as against creditors, it is as if it had never been made, and if no such conveyance had been made, it is clear that the fact that the sons gave their father moneys to pay his premium would not give them any lien on the proceeds. Nor do they claim any interest in these proceeds at all in any way. If the fact is to have any legal effect at all, it must be as a defence to prevent the administrator from recovering at all. It is not pretended that Mrs. Masters ever paid any of the premiums, either with her own money or in any other way. The policies were not taken out by her, or assigned to her, so that she could pay the premiums; they were merely made payable to her in case of death.

*C. E. Gross*, for the appellees.

J. M. HALL, J. The finding in this case shows that Arthur W. Masters, a trader in St. John, New Brunswick, Canada, on July 2d, 1870, took out two policies of insurance upon his life in the Connecticut Mutual Life Insurance Company of Hartford, Connecticut, each for the sum of $2,500, and payable to his legal representatives upon his death. One of the policies was a ten payment life policy,

upon which an annual premium of $206.53, less dividends, was to be paid for ten years, and the other was an ordinary life policy requiring an annual payment of $128.83, less dividends. The premiums on each of these policies were duly paid in 1871 and 1872.

On February 3d, 1873, Masters made an assignment for the benefit of his creditors under the insolvent act of 1869 of the Dominion of Canada, to an official assignee. The first meeting of creditors was held on February 22d, 1873, to receive a statement and appoint an assignee of the estate and effects of Masters under said insolvent act. At that meeting Masters met his creditors, and when asked by them about his assets, told them, after mentioning other items of property, that he held the two policies of insurance above described, and also informed them that but two premiums had been paid upon them. The creditors discussed the value of the policies in a general way, some of them expressing the opinion that they were of very little value. It appears also from the finding that the Bank of New Brunswick, on account of whose claim the present action was brought, was present at the meeting of creditors by counsel, but it does not appear whether the bank was at that time a creditor or not. The assignee never demanded, claimed or took possession of the policies, nor did any of the creditors ever take any action to obtain such possession. On January 17th, 1874, Masters surrendered the policies to the insurance company, and new policies were at his request issued for the same amounts and premiums and identical in all respects with those surrendered, except that they were made payable to his wife, Hannah Masters. On February 4th, 1874, Masters was duly discharged in insolvency, and there was not at the date of this suit any creditor whose claim was outstanding at the time of the insolvency, or so far as it appeared of the discharge. After Masters took out the new policies for the benefit of his wife, he applied to his sons for help to keep up the policies, as he was unable to pay the premiums upon them. They from time to time thereafter advanced money to pay these premiums. The premiums on

one of the policies became actually paid up in July, 1879. The premium of $128.83 on the other policy, less the dividends, was duly paid each year until the death of the insured. The sons paid directly the premium due in 1883 on the last named policy, and annually thereafter.

In April, 1883, Masters again failed in business, and was then indebted to said Bank of New Brunswick on claims which originated after the beginning of the year 1883, and which are now represented by two judgments amounting to upwards of $2,600. Masters died October 23d, 1888. Thereupon the bank as such creditor caused application to be made in the court of probate for the district of Hartford for the appointment of an administrator upon his estate, and the plaintiff was duly appointed administrator and commenced this suit, in which the defendant subsequently filed an answer by way of cross-bill, and asked that Hannah Masters be made a party thereto and interplead with the plaintiff, as appears of record. No claim against said estate other than that of said bank has been presented or is known to exist. The policies in question were not liable to be taken on execution for the payment of debts in the province of New Brunswick either in 1873 or in 1874, but would have been assets, if of any value, in the hands of the assignee in insolvency, if he had taken possession of them.

Upon the foregoing facts the plaintiff claims in his appeal, as matter of law, that the surrender and re-issue of the policies was fraudulent and void as against the creditors whose claims existed at the time such surrender was made, and if so fraudulent as against existing creditors, then such surrender and re-issue can be avoided by any subsequent creditor.

A proper consideration of this legal proposition requires its division. The first question is, whether, in view of all the facts found by the court below, the act of Masters, the insolvent, in surrendering the policies to the company and causing them to be re-issued in favor of his wife, was a fraudulent act upon his existing creditors.

A policy of life insurance being a contract to pay a fixed sum of money to the beneficiary of the policy, provided cer-

tain stipulated premiums are paid, constitutes a chose in action, its value depending on the nearness of the day for the performance of the contract. Undoubtedly wherever choses in action belonging to a debtor may be reached by creditors, a voluntary transfer of a life insurance policy in fraud of the rights of creditors may be set aside for their benefit. " Where a person has taken out policies of insurance upon his life for the benefit of his estate, it has been frequently held that, as against creditors, his assignment when insolvent of such policies to or for the benefit of wife and children, or either, constitutes a fraudulent transfer of assets within the statute, and this even though the debtor may have had no deliberate intention of depriving his creditors of a fund to which they were entitled, because his act has in point of fact withdrawn such a fund from them and dealt with it by way of bounty. The rule stands upon precisely the same ground as any other disposition of his property by the debtor. The defect of the disposition is that it removes the property of the debtor out of the reach of his creditors." *Central Bank* v. *Hume*, 128 U. S. R., 204.

We understand this to be a correct statement of the law as now generally accepted. *Freeman* v. *Pope*, L. R., 9 Eq. Cas., 206 ; *Cornish* v. *Clark*, 14 id., 189 ; Bump on Fraudulent Conveyances, 239, and cases cited. 1 Story's Eq. Jur., §§ 367, 368. The decisions of this court are to the same effect. *Freeman* v. *Burnham*, 36 Conn., 473 ; *Paulk* v. *Cooke*, 39 id., 566 ; *Allen* v. *Rundle*, 50 id., 32.

In all such cases, however, the form or manner of the particular conveyance or the circumstances surrounding the transaction may exempt it from the operation of this general rule. It will be observed in the principal case cited, ( *Central Bank* v. *Hume, supra*,) that this doctrine is based upon the ground that the debtor has actually withdrawn a fund from his creditors available for the payment of debts. The court distinctly declares that the rule laid down by them applies only to that which the debtor could have made available for the payment of debts.

The value or rather the want of value, of these policies,

therefore, as an available asset for the payment of creditors, becomes important in settling the question now under consideration. The fact that but two premiums had then been paid on the policies would have entitled the assignee only to paid-up policies for small amounts, payable on the death of Masters. Both policies provide " that if after the payment of two or more annual premiums upon this policy the same shall cease and determine by default in the payment of any subsequent premiums when due, then, notwithstanding such default, this company will grant a paid-up policy (payable as above) for such amount as the then present value of this policy will purchase, as a single premium ; provided that this policy shall be transmitted to and received by this company and application made for such paid-up policy within one year after default in the payment of premium herein shall first be made."

It is manifest that the policies had no cash surrender value, and even if they had been reduced to possession by the assignee it is not probable that he could thereby have increased the cash in his hands for distribution to creditors. Doubtless this consideration influenced both assignee and creditors in deciding to treat the policies of insurance as worthless to the insolvent estate. Masters's conduct concerning the policies removes from him any suspicion of an intent to defraud his creditors. He did not conceal, but promptly revealed at the first opportunity he had, their existence, and was apparently ready at all times to put the assignee in possession of them. He held them nearly a year, and until by the provisions of the insolvent act proceedings looking to his discharge in insolvency must have been commenced. Here was an open disclosure and offer of the policies by the debtor to his creditors and their assignee, and an entire neglect on the part of both for such a time as to raise a presumption that they had abandoned the policies as of no value —as in fact they did, for no creditor of 1874 has ever made any claim to them. " The insolvent law assumes that creditors will reject nothing that has a seeming value." *Filley* v. *King*, 49 Conn., 214.

Acting upon this lawful assumption, Masters, on the 17th day of January, 1874, less than three weeks before the date of his discharge, caused the policies to be re-issued and made payable to his wife. As his discharge was granted after the transfer of the policies, and could have only been granted by the action of his creditors representing in value at least three fourths of his total liabilities, and as all his creditors had knowledge of the existence of the policies in question, it is not a violent inference that they knew and approved of this act of Masters. At all events there is nothing in the whole transaction that indicates any intent on Masters's part to defraud his existing creditors.

No evidence was offered in the court below tending to prove that these policies, with but two premiums paid thereon, eight more to be paid on one and an indeterminable number on the other, had any value as an asset in 1874, nor does the finding show they had such value. All the facts upon the record justify the conclusion that all the creditors of Masters regarded the policies in question as absolutely valueless for the payment of the insolvent's debts.

If this is true, then another element indispensable to a fraudulent conveyance is wanting in this case. To constitute a disposition of property by a debtor with intent to defraud his creditors, the thing disposed of must be of some value, out of which the creditor could have realized his claim or some part of it. *Hoyt* v. *Godfrey*, 88 N. York, 669.

If not fraudulent or prejudicial to creditors, then under the settled law there can be no question as to the insolvent's right to transfer the policies to his wife or for her benefit. *Darcy, Trustee,* v. *Ryan,* 44 Conn., 520 ; *Benton* v. *Jones,* 8 id., 186 ; *Converse* v. *Hartley,* 31 id., 379 ; *Gilligan* v. *Lord,* 51 id., 562.

But even if the policies had been found to have been of value as an asset for the then existing creditors of Masters, and on that account we were compelled to hold their transfer fraudulent as to such creditors, we should still, under the facts of this case, be unable to sustain the plaintiff's claim.

The demand sought to be enforced in this action did not

arise till nine years after Masters's discharge in insolvency. By the terms of the Canadian insolvent act the effect of such discharge was to completely absolve the insolvent debtor from all liabilities whatsoever then existing against him and provable against his estate. It was equivalent to payment by Masters, and left him free to face the world anew unburdened by debt. Insolvent Law of Canada, 32 and 33 Vict., chap. 16, §§ 109, 110.

Under such a state of facts there is no ground upon which a subsequent creditor can attack the conveyance in question. While the authorities differ as to whether, to entitle a subsequent creditor to relief, he must show that at the time of the commencement of his suit there were debts still outstanding which the debtor owed at the time he made the alleged fraudulent conveyance, yet all will agree that there must at least have been debts contracted before the conveyance which remained unpaid at the time when the subsequent creditor's debt was created. A subsequent creditor must rest the foundation for his individual relief upon the equity of an antecedent creditor. *Claflin* v. *Mess*, 30 N. Jer. Eq., 212; 2 Bigelow on Fraud, 107. The case at bar fails to disclose the existence of a single unsatisfied debt created prior to the origin of the claim in suit.

Payment or satisfaction by a debtor of all debts existing prior to the time he makes a voluntary conveyance, repels the idea that he thereby intended to defraud creditors. *Claflin* v. *Mess, supra; Freeman* v. *Pope, supra; Lush* v. *Wilkinson*, 5 Ves., 387; 1 Am. Lead. Cases, 41; Kerr on Fraud, 207, and cases cited.

There is no error in the judgment appealed from.

In this opinion the other judges concurred.