Merchants' and Miners' Transportation Co. *v.* Borland.

---

THE MERCHANTS' AND MINERS' TRANSPORTATION COMPANY

*v.*

LOUISA BORLAND et al.

1. Payments made by a debtor as premiums upon a policy of life insurance upon his own life for the benefit of a wife and child, are essentially gifts to the beneficiary, and conclusively fraudulent and void as against creditors existing at the time of such payments.

Merchants' and Miners' Transportation Co. v. Borland.

2. The contrary doctrine advanced by the supreme court of the United States, in *Central Bank* v. *Hume*, *128 U. S. 195*, is not binding on the courts of this state.

3. The act of February 19th, 1851, as amended by the act of March 8th, 1871 (*Rev. p. 640*), does not authorize a husband who is indebted to pay premiums upon a policy upon his life for the benefit of his wife, and enable her to hold the proceeds of the policy as against a creditor of the husband existing at the time of such payments.

4. A creditor of a decedent by judgment recovered against him in another state, the existence of which is admitted by the personal representative, is entitled to maintain a suit in this court to reach equitable assets, viz., moneys given by the debtor to his wife and children in fraud of the judgment creditor.

On demurrer to bill.

The defendants are the widow and four children of Robert B. Borland, late a resident of this state, who died insolvent July 15th, 1893. The complainant is a creditor of the deceased by judgment recovered in the State of New York, and the object of the bill is to compel the defendants to pay complainant's judgment out of certain moneys received by them from certain life insurance companies, in payment of certain policies of insurance taken out by the deceased upon his life for the benefit of his wife and children, the annual premiums upon which were paid by him out of his own moneys mostly after the recovery of complainant's judgment.

The principal question raised by the demurrer is the general one as to the merits of complainant's claim.

More specifically stated, the facts set out in the bill and admitted by the demurrer are as follows:

On November 11th, 1886, complainant recovered in the supreme court of New York a judgment against Borland, then a resident of New Jersey, for $6,309.54, for which amount Borland was then indebted to complainant. No part of this indebtedness has ever been paid, and the whole, with interest, still remains due. Borland died July, 1893, insolvent to the extent of ninety-seven per cent. of his indebtedness.

1. In December, 1886, after the recovery of complainant's judgment, Borland procured from the Mutual Benefit Life Asso-

ciation of New York a policy upon his life for $5,000, in favor of his four children, defendants.

2. On the same day he procured from the same company a like policy for $5,000, in favor of his wife, Louisa, defendant.

3. In 1886, and after incurring the indebtedness to complainant merged in the judgment, exact date not given, Borland took out a like policy from the Mutual Life Insurance Company of New York for $30,000, in favor of his wife, Louisa, defendant.

These several policies were subject to the payment of certain annual premiums, the amount of which is not stated in the bill, but it is there alleged that they amount to over $1,400 a year, and were paid by Borland out of his own means and money up to his death.

4. In the year 1890, exact date not given, Borland took out another policy of insurance upon his life from the Mutual Life Insurance Company of New York for $5,000, in favor of his wife, Louisa, the annual premium upon which was $293, which was paid by him each year, until he died, out of his own money and means.

5. In the year 1891, exact date not stated, Borland took out another policy upon his life from the Mutual Life Insurance Company of New York for $5,000, in favor of his wife, the annual premium upon which was $308, which was paid by him to the company out of his own money and means each year until he died.

In addition to the foregoing five policies, Borland had taken out, in 1876, from the Mutual Life Insurance Company of New York, a policy upon his life for $5,000, in favor of his four children above named, the annual premium upon which was $161, which was paid by him each year up to his death, as well before as after the recovery of complainant's judgment, out of his own means and money.

At his death two of his children were minors, and letters of guardianship of them were granted by the surrogate of Hudson county to his widow, the defendant Louisa.

The bill charges that these annual payments of premiums were so paid by Borland for the purpose of placing so much of his

means beyond the reach of his creditors, and for the purpose of defrauding the complainant, and that he during the whole period was insolvent.

The bill further alleges that all these policies have been paid in full—those in favor of Mrs. Borland to her in her own right, those in favor of the children in part to her as guardian and in part to those who were of age.

It further alleges that Borland died testate of a will by which he gave his wife his whole estate and appointed her executrix ; that she proved such will before the surrogate of Hudson county, and undertook the burthen of its execution ; that he left no real estate whatever, and personal estate to the value of $1,350 only ; that preferred claims against the estate, amounting to $878, were presented to the executrix, and other claims (whether including complainant's or not is not distinctly stated), amounting to $13,457.72, have been duly presented, under oath, to the executrix, so that the estate will not pay above three per cent. of the general indebtedness, including complainant's claim.

Mrs. Borland is made a party defendant as executrix as well as individually, but no decree is prayed against her as executrix.

*Mr. William B. Gillmore,* for the complainant.

*Mr. Isaac S. Taylor,* for the defendants.

PITNEY, V. C.

There is no mystery or charm about life insurance. It is not a means of creating wealth, nor yet a contract of mere indemnity, as is that of fire and marine insurance. It is, in its most usual form, simply a mode of putting by money for savings. A sum of money is paid half-yearly or yearly, as the case may be, to a corporation, which receives and invests it carefully, and adds to it its yearly earnings, and, in consideration of such payments, agrees to pay the party insured, or such other person as may be named, a sum certain upon his death. The amount so agreed to be paid is arrived at by taking the age and state of health of the party at whose death the money is to be paid,

and estimating how many years he will probably live. This is arrived at by consulting what are called the "Tables of Mortality," viz., an account kept for a great number of consecutive years of the ages at which men and women die, and taking the average of all such ages. By this means, the probable number of years any man or woman of a given age and of ordinary health will live may be arrived at with reasonable certainty. Having ascertained this chance of life, the company fixes such an annual rate as will, with accretions, at the time of the death of the party insured, amount to the sum agreed to be paid, together with the cost of investment, care and so forth. Some of those so insured will live longer and some not so long as the tables indicate they ought to live. The real business of the insurance company, as distinguished from that of any other investment company or ordinary savings bank, is to collect over-payments from those who live beyond the average period—the long-livers—and to pay their proceeds to those who do not live the average period—the short-livers. This distinction, however, does not alter, in legal contemplation, the intrinsic character of the transaction between the insurer and assured, which is that of paying money to-day in expectation of its repayment at a future day, either to the party paying it or to such other person as he or she may name. There is, and can be in law, no difference between the payment by a husband of a stated sum of money at stated periods to an insurance company, upon promise to pay a certain sum at the death of the payer, to his wife, and the deposit by the husband of a like stated sum, at like stated periods, in a savings bank, to the credit of the wife. Both are gifts to the wife, and the money afterwards paid by the savings bank or insurance company, as the case may be, to the wife or her personal representatives, is nothing more than a payment to her of the money previously paid to it by the husband, with its earnings and increase.

The illustration I have used is that of the form of life insurance, so called, in most common use, and it is the one here in question. But the same reasoning applies to the other forms of life insurance. For instance, if the premium—by which is

meant the cash consideration paid to the insurer—is paid, as it may be, all at once, in a single down-payment, and the insurer agrees to pay a greater sum at the death of the assured, it is a mere mode of placing a certain sum of money at interest, to be repaid at death, the amount of interest being fixed by the probability of life of the assured.

The case presented, then, is this: A debtor owing a large sum of money upon a judgment, and plainly insolvent, is in receipt from some source, each year, of money and means belonging to himself, over and above what he finds necessary or proper to expend for current expenses, to the amount of about $1,500, and instead of devoting it to the payment, *pro tanto*, of his debt, he makes a present of it to his wife and children by the machinery of divers policies of life insurance, with the result that, at his death, he has given his wife in premiums enough to pay his debt, and she has become practically rich at the creditor's expense.

This statement of the case seems to me to decide it. The old maxim that a man must be just before he is generous, applies.

I am unable to discover any principle or well-considered authority upon which such a transaction can be sustained against creditors. To do so would, as it seems to me, be to run counter to principles so well settled and familiar as hardly to require recital. A husband cannot settle money or property in any shape upon his wife while he is indebted. If he attempts it the creditors are entitled to the aid of this court to reach the property so settled, in whatever form it may be found.

The great weight of authority holds that payments on account of life policies for the benefit of another must be considered as made in fraud of creditors. *Davis* v. *Wace, 1 Campb. 487; Skarf* v. *Soulby, 1 McN. & G. 360; Jenkyn* v. *Vaughan, 3 Drew. 419; 2 Jur. N. S. 109; 25 L. J. Ch. 338; Stokoe* v. *Cowan, 29 Beav. 637; 7 Jur. N. S. 901; 30 L. J. Ch. 882; Freeman* v. *Pope, L. R. 9 Eq. Cas. 206; 5 Ch. App. 536; Taylor* v. *Coenen, L. R. 1 Ch. Div. 636.*

The foregoing were all cases of policies taken out in the name and for the benefit of the party whose life was assured, and by

him assigned to a beneficiary. But I am unable to perceive any difference between such a case and that of a policy taken out in the first instance in the name and for the benefit of a third party. Take the case of a policy issued in consideration of a single down-payment. If a debtor invests a sum of money in a policy for a certain sum payable to his personal representatives at his death, and then assigns that policy to his wife, that is an indirect mode of making a settlement upon her. If instead of taking the policy payable to his personal representative, he should have it made payable directly to his wife, that seems to me to be making a direct settlement upon his wife. It is, in effect, loaning a sum of money to the insurance company, and taking the contract of the company to repay it with a fixed interest to his wife at his death.

*Holt* v. *Everall, L. R. 2 Ch. Div. 266 (1876)*, was the case of a policy taken out by a husband in favor of his wife under the new English Married Women's acts, which validate such policy unless the creditor shall prove that the policy was taken and premiums paid by the husband with intent to defraud his creditors. Vice-Chancellor Hall found, as a fact, that the husband had paid the premiums for the purpose of defrauding his creditors. The court of appeals differed with him on the question of fact and found the premiums had been, in fact, paid by the wife, and upheld the transaction; but Lord-Justice James (at *p. 274*) says: "But it would be a very different thing as regards this transaction if the premiums were paid out of the husband's money. That might affect the main question itself, and certainly the payment of the premiums out of the husband's money becomes important, because, under the Married Women's Property act, if any premiums are paid by the husband with intent to defraud the creditors, those premiums ought to be repaid to the husband's creditors, and one part of the bill is addressed to that particular relief." And to the same effect is what was said by Lord-Justice Mellish.

The view above set forth is so well supported by the opinion of the supreme court of Alabama, in the case of *Fearn* v. *Ward,. 80 Ala. 555* (at *p. 560*) that I transcribe it here:

"The procurement of the policy of insurance by Robert Fearn in favor of his child, and the payment of the premium with his funds, constitute a gift to her, a voluntary conveyance based on parental affection, which is void as to his existing creditors, though no fraud may have been intended. It is a voluntary provision effected by converting to her benefit money which in equity and good conscience should have been paid to his creditors. Though the law regards the parental duty of maintenance and the consequent duty of making provision for the future when the father may no longer exercise protecting care, it subordinates the discharge of those duties to obligations to his creditors, and declares void as to them any voluntary appropriation of property not authorized by legally-expressed exemptions or privileges. If money belonging to a debtor, which should be paid to his creditors, is used in the purchase of property for the benefit of another merely on good consideration, the property purchased becomes the property of the debtor, as to his creditors. A father who procures a policy of insurance to be issued on his life, payable to his child, and pays the premiums with his own money, makes a voluntary gift or assignment of a portion of his estate, which constitutes an investment for the benefit of the person for whose benefit the policy was issued. There can be no difference between a policy thus procured and the assignment of a policy originally issued in his own name. The insurance constitutes the property purchased, and is the subject-matter of the investment. If the father be in debt, such voluntary investment is fraudulent in law, as to his existing creditors, without regard to his intent or to his circumstances and condition as to his ability to pay. * * * Without the statutory intervention, the whole of the insurance would be subject to the debts of the insured."

It is hardly necessary to state that it is settled law in New Jersey that all voluntary gifts are conclusively fraudulent and absolutely void as against all existing creditors without regard to the actual intention of the donor. *Haston* v. *Castner, 4 Stew. Eq. 697, 701 et seq.; Arnold* v. *Hagerman, 18 Stew. Eq. 186; Gardner* v. *Kleinke, 1 Dick. Ch. Rep. 90.*

19

Merchants' and Miners' Transportation Co. v. Borland.

In looking at the American authorities it must be borne in mind that in many of the states the statutory law provides, as in England the act just referred to, that husbands may insure their lives for the benefit of their wives or children, or both, and that the wife or child in such case shall be entitled to receive the proceeds of the policy against the creditors of the husband and father. In a few states no limit is placed upon the amount which a husband and father may, in this mode, abstract from his business or earnings and settle on his family. In most of the states, however, the amount is limited, as, indeed, common justice requires it should be, to a sum certain in each year.

In New York—the only state except our own in which, for present purposes, we are interested—it is fixed at $500 a year.

The only statute in New Jersey is that of February 19th, 1851 (*Nix. Dig. 1868 p. 548*), as amended by the act of 1871 (*P. L. of 1871 p. 25; Rev. p. 640*). That act before being amended provided :

" 1. It shall be lawful for any married woman, by herself and in her name, or in the name of any third person, with his assent, as her trustee, to cause to be insured for her sole use the life of her husband, for any definite period, or for the term of his natural life; and in case of her surviving her husband, the sum or net amount of the insurance becoming due and payable by the terms of the insurance, shall be payable to her, to and for her own use, free from the claims of the representatives of her husband or his creditors; but such exemption shall not apply where the amount of premium annually paid shall exceed $100.

" 2. In case of the death of the wife before the decease of her husband, the amount of the insurance may be made payable, after the death, to her children for their use, and to their guardian, if under age."

As amended, the last clause of section 1 was omitted.

This act is in marked contrast with most of those of other states. That of Massachusetts (*Gen. Stat., ch. 58, 62*, cited in *99 Mass. 155*), provides that " the policy shall be good whether *procured by herself*, her husband, or any other person." That of Connecticut provides that any policy of life insurance expressed to be for the benefit of a married woman shall inure to her separate estate, but if the annual premiums exceed $300, the amount of such excess shall go to the creditors of the person paying the premium.

The New York act more nearly resembles ours. In fact, it is precisely like ours until you come to the last clause of the first section of our act as originally enacted. That clause, as above quoted, is: "But such exemption shall not apply where the amount of premium annually paid shall exceed $100." The New York act, as it now stands, reads:

"But when the premium paid in any year *out of the property or funds of the husband shall exceed $500, such exemption from such claims shall not apply to so much of said premium so paid as shall be in excess of $500, but such excess, with the interest thereon, shall inure to the benefit of his creditors.*" P. L. of N. Y. 1870 ch. 277, cited in *Stokes* v. *Ammerman, 121 N. Y. 341, 342.*

This statute has been held in New York to warrant the setting aside by a husband of $500 a year for the benefit of his wife. *Barry* v. *Equitable Life Assurance Society, 59 N. Y. 587, 593.* And in *Stokes* v. *Ammerman, supra,* it was held that all beyond $500 a year must go to the creditors.

Acts of this character are, properly enough, called "exemption laws," and unless some limit is placed upon the amount by them permitted to be annually settled on the wife, they furnish a ready means by which a husband, no matter how much he may owe, may settle all his property upon his wife, to the complete discomfiture of his creditors, and they may well be called statutes whereby fraud is encouraged and ratified. For this reason they should be carefully examined, and when without limit should be strictly construed.

But to return to the case in hand. The case does not show within what jurisdiction the several contracts were entered into, or in what state the several insurance companies are domiciled, except as it may be inferred from their names that they are New York corporations. If the case is to be adjudged by the law of New York there is an end of the defence, since it appears that the annual payments were largely in excess of $500, and as to the premiums upon the policy for the benefit of the children there is no statutory protection whatever.

Let us now consider the true construction and effect of our own statute. That had its origin in our state in the fourth and fifth sections of the charter of the Mutual Benefit Life Insurance

Company (*P. L. of 1845 p. 27*), from which the act of February 19th, 1851 (*P. L. of 1851 p. 34; Nix Dig. 1868 p. 548*), was copied, the only change being that the limit of annual payments was reduced from $300 to $100. The fourth and fifth sections of the charter of the Mutual Benefit Life Insurance Company are an exact rescript of the New York act of 1840. *P. L. of 1840 ch. 80 §§ 1, 2.* That act, which was the first of the kind in New York, was amended in 1858 (*P. L. of 1858 ch. 187 § 1*) by adding the words " out of the funds or property of the husband," so that it read, " but such exemption shall not apply where the amount of premiums annually paid *out of the funds or property of the husband* shall exceed three hundred dollars." These words, or any equivalent, have never been introduced into our statute. A question having arisen in New York whether the amendment of the New York statute just referred to had the effect of giving the creditor the whole proceeds of the insurance where there had been an excessive payment by the husband, the act was further amended in 1870, so as to read as it now stands and as it is above quoted.

·The object and purpose of the New York statute of 1840 seems to me to be readily ascertained. In the first place, it was doubtful, to say the least, whether, by the common law as declared by the courts of that state and under their statutes against wagers, a policy taken out by a wife upon her husband's life was not void as a wager (see *Ruse* v. *Mutual Benefit Life Insurance Co., 23 N. Y. 516*), and, as life insurance was then in its infancy, it was prudent, to say the least, to provide against any such result. In the second place, all the wife's personal property and the income of her real estate belonged, at that time, absolutely to the husband. This marital right included her earnings. *Schoul. Dom. Rel. § 81; 1 Bish. Mar. W. tit. "Marriage and Divorce" §§ 21, 212.* Hence, a policy of insurance upon the husband's life for the benefit of the wife, the premiums being paid by her (with money which, but for her coverture, would belong to her), would belong to the husband. Thus it was held in *Moehring* v. *Mitchell, 1 Barb. Ch. 264*, where a wife had insured her husband's life for her own benefit, immediately after

the above-recited enactment of 1840, and had, with his consent, endorsed upon the policy a well-executed testamentary disposition, and husband, wife and only child had sailed upon and were lost with the steamer "President," the testamentary disposition was held to be of no avail and the case not within the provisions of the act of 1840, and the proceeds of the policy given to the husband's representatives.

If the policy in such a case would belong to the husband, then, of course, his creditors could take it.

This view of the object of the act is strengthened by the fifth section of the Mutual Benefit company's charter, which was the second section of the New York act and is the second section of our act as above quoted. The object of that section was, and is, to prevent the policy from going to the husband under his marital rights.

These considerations show that some legislation was proper, if not necessary, in order to insure the validity of a contract of insurance in favor of the wife and to protect it from the husband's creditors, even where the premiums were paid by her out of what would be called, in common parlance, her own moneys.

The general right, at common law, of the husband to his wife's property and income was always subject to the limitation of a reduction thereof to possession by him (*Stall* v. *Fulton, 1 Vroom 430*), and a husband was at liberty to permit his wife to collect and retain her own earnings and income. Here we find at once a source from which a wife might, at the common law, have a fund out of which to pay the premiums upon a policy of insurance upon her husband's life for her own benefit, and take advantage of the provisions of the statute in her favor.

In this state of the law, and it not having yet been decided in this state that life insurance policies were not void as wagers (*Trenton Mutual Life and Fire Insurance Co.* v. *Johnson, 4 Zab. 576*, decided in 1854), the object and purpose of the legislation in question in this state was precisely the same as in New York. Thus, the introduction of the sections in question into the charter of the Mutual Benefit Life Insurance Company is accounted for, and also its subsequent introduction into the general statutory

system of the state in 1851, a year before the Married Woman's act was passed.

There is nothing in the language of the enactment which indicates an intention to enable the husband to set aside a portion of his property or income to the use of his wife as against his creditors. The language used indicates that the authority is to the wife to procure the policy and to pay the premiums on it. Further, it is to be observed that the legislature in 1871, after the passage of the Married Woman's act securing her separate estate to her own use (*P. L. of 1871 p. 25*), deliberately struck out of the act the clause limiting the amount which a wife might so invest in a policy. This I cannot believe would have been done if the legislature had understood that by the true construction of the act a husband was thereby empowered to invest his own moneys in a policy for his wife which she might hold as against his creditors. The result of such construction, after the limit was removed, would be to enable a husband to settle all his property in a lump on his wife at the expense of his creditors.

It follows that our act does not authorize such investment by the husband. A contrary result under the New York statute is due to the interpolation therein, in 1858, of the words "out of the funds or property of the husband," as above shown. The introduction of these words raised an implication that the husband was so empowered as against his creditors.

I should have deemed it not worth while to spend so much time and space upon the general question of the right of a husband or father to settle property upon his family by the machinery of life insurance, but for a recent decision of the supreme court of the United States which is supposed to militate against the views I have taken. I refer to *Central Bank* v. *Hume, 128 U. S. 195.* I do not propose to indulge in a general criticism of the doctrines there advanced. This has been done in an able and thorough manner by Mr. Williston in the *American Law Review, vol. 25, p. 185,* and I refer particularly to and adopt his language found on page 196. It is enough to say that there were in that case circumstances which rendered it exceptional and warranted the result arrived at without infring-

ing upon the long established and wholesome rules of law for the protection of creditors, and much of what was said by the learned chief-justice was *obiter*.

The only point, however, actually decided in that cause which can be invoked in defendants' favor is this : "A married man may rightfully devote a moderate portion of his earnings to insure his life, and thus make reasonable provision for his family after his decease, without being thereby held to intend to hinder, delay or defraud his creditors ; provided no such fraudulent intent is shown to exist or must be necessarily inferred from the surrounding circumstances."

Now, if we should apply that test here, I should feel constrained to hold that the circumstances do, of necessity, show a fraudulent intent. A man who has just suffered a large judgment to be recovered against him, and at once procures a very large policy of insurance to be issued on his life for the benefit of his wife, and keeps it up for years by payment of the annual premiums, and during all that time does not pay anything on his judgment indebtedness, does by such conduct at once induce the belief that he intended thereby to devote money to the enrichment of his wife which he ought in mercantile honesty to have applied to the payment of his debt, and such conduct is in law and morals a hindering, delaying and defrauding his creditors. But whether I am right or not in this view, the law in this state is, as above shown, well settled that all such gifts and payments are conclusively fraudulent and void as against any existing creditor, such as the complainant here. Upon such questions I must be guided by the decisions of the highest court of our own state. While the utterances of the supreme court of the United States are binding throughout the union upon certain constitutional and statutory questions, and are entitled to great weight upon all questions, they cannot be considered as authoritative on such as are here involved, outside of the District of Columbia, where, in fact, the case just cited arose.

The result is that whether the contracts here in question are to be construed by the law of the State of New York or by that of New Jersey, the complainant is entitled to relief. So much for the merits.

Merchants' and Miners' Transportation Co. *v.* Borland.

The further point was made by the defendants that complainant has no standing in this court because it did not show that it issued an execution upon its judgment, thereby exhausting its remedy at law, citing *Roberts* v. *Hodges, 1 C. E. Gr. 299,* and that line of cases; and further, that it does not appear that complainant has presented a claim upon its judgment against the personal representative of the deceased.

I think neither of the points are well taken. The object of requiring a judgment as a foundation of a right to a standing in this court in a case like this is that the debt should be conclusively established, and should be in a shape to reach any property the defendant may have, and the object of issuing an execution and having a return of *nulla bona* is to show the necessity for coming to this court to reach equitable assets not liable to execution.

But, as shown in *Haston* v. *Castner, 4 Stew. Eq. 697,* neither of these prerequisites is required after the death of the debtor, provided the debt be admitted by the personal representative, and the deficit of assets in his hands appears.

Nor is it necessary that there should be a request to the personal representative to sue, and a refusal on his or her part so to do, before coming here for relief of the kind here asked. This is shown by the learned chief-justice in the course of his opinion in *Haston* v. *Castner, supra,* where he says : " But, in the second place, it is obvious that, in many cases, perhaps in most, there would be serious difficulties in the way of a procedure of this nature being instituted in the name of the personal representative, because conveyances of this character depend very often for their effect on the relations of the debtor towards particular creditors, so that, while they may be void as to some of such creditors, they may be valid as to others. Suggesting, therefore, these embarrassments, but without concluding that the personal representative may not take proceedings of this kind, after having obtained, in the orphans court, an order for the sale of the lands of the debtor, it is sufficient now to say that it is a convenient practice, and is not open to legal objection, for the indi-

Merchants' and Miners' Transportation Co. v. Borland.

-vidual creditor, for his own benefit, and in behalf of others -similarly situated, to institute these suits."

Besides this consideration, it is obvious that it would be idle to ask the personal representative here to sue herself and children. If it be said that complainant may ask the orphans court to charge the executrix in her account with the amount of premiums received by her, the answer is two-fold—*first, non constat* that all the creditors are entitled to share in the fund now being pursued; and *second,* such proceeding would not reach the moneys received by the children.

The case, then, stands thus: By the demurrer it is admitted by all the defendants, including the personal representative, that complainant is a creditor by judgment recovered in the sister State of New York, which is as conclusive here as if recovered here in our own courts; that the estate is largely insolvent; that there is no real estate or personal property upon which a levy could be made; and that the defendants hold moneys received indirectly from the judgment-debtor by an arrangement fraudulent and void as to the complainant. Upon such a case it seems to me there can be no question as to the right of complainant to some measure of relief. As remarked by the court in *Stokes* v. *Ammerman, 121 N. Y. 341,* it is not for present purposes necessary to define just what that measure of relief, in the absence of an answer, may be. If the complainant has not presented its claim under oath to the executrix, it may be, possibly, as against these defendants that it will be obliged to credit upon its debt the amount of such dividend as it would have received if the claim had been duly presented. If, on the other hand, such claim has, in fact, been presented and no dividend as yet declared and paid upon it, the defendants will probably be entitled to be subrogated to the rights of the complainant against the estate in the hands of the executrix. These are matters to be worked out according to equitable principles in the further progress of the suit.

The demurrer must be overruled, with the usual consequences.