# CENTRAL BANK OF WASHINGTON *v.* HUME.
# HUME *v.* CENTRAL BANK OF WASHINGTON.

APPEALS FROM THE SUPREME COURT OF THE DISTRICT OF COLUMBIA.

Nos. 29, 30.  Argued October 17, 18, 1888. — Decided November 12, 1888.

It is a general rule that a life-insurance policy, and the money to become due under it, belong the moment it is issued to the person named in it as beneficiary, and that there is no power in the person procuring the insurance, by any act of his, by deed or will, to transfer to any other person the interest of the person named.

A married man may rightfully devote a moderate portion of his earnings to insure his life, and thus make reasonable provision for his family after his decease, without being thereby held to intend to hinder, delay, or defraud his creditors, provided no such fraudulent intent is shown to exist, or must be necessarily inferred from the surrounding circumstances.

The payment of premiums to a life insurance company by a married man residing in the District of Columbia, who is insolvent at the times of the payments, in order to effect and keep alive a policy of insurance upon his own life, made by his wife for the benefit of herself and their children, is not necessarily a fraudulent transfer of his property with intent to hinder, delay and defraud creditors within the meaning of 13 Eliz. c. 5; and in the absence of specific circumstances showing a fraudulent intent, his creditors, after his decease, will have no interest in the policy.

In order to maintain an action on behalf of creditors of a deceased person against a life insurance company, to recover back premiums alleged to have been fraudulently paid by the decedent while insolvent to the company in order to make provision for his wife and children, it must be alleged and proved that the company participated in the fraud.

On the 23d of April, 1872, in consideration of an annual premium of $230.89, the Life Insurance Company of Virginia issued at Petersburgh, in that Commonwealth, a policy of insurance on the life of Thomas L. Hume of Washington, D. C., for the term of his natural life, in the sum of $10,000, for the sole use and benefit of his wife, Annie Graham Hume and his children, payment to be made to them, their heirs, executors, or assigns, at Petersburgh, Virginia.

The charter of the company provided as follows: "Any policy of insurance issued by the Life Insurance Company of Virginia on the life of any person, expressed to be for the benefit of any married woman, whether the same be effected

originally by herself or her husband, or by any other person, or whether the premiums thereafter be paid by her herself or her husband or any other person as aforesaid, shall enure for her sole and separate use and benefit and that of her or her husband's children, if any, as may be expressed in said policy, and shall be held by her free from the control or claim of her husband or his creditors, or of the person effecting the same and his creditors." (Section 7.)

The application for this policy was made on behalf of the wife and children by Thomas L. Hume, who signed the same for them.

The premium of $230.89 was reduced by annual dividends of $34.71 to $196.18, which sum was regularly paid on the 23d of April, 1872, and each year thereafter, up to and including the 23d of April, 1881.

On the 28th of March, 1880, the Hartford Life and Annuity Company of Hartford, Connecticut, issued five certificates of insurance upon the life of Thomas L. Hume, of $1000 each, payable at Hartford to his wife Annie G. Hume, if living, but otherwise to his legal representatives. Upon each of these certificates a premium of ten dollars was paid upon their issuance, amounting in all to $50, and thereafter certain other sums, amounting at the time of the death of Hume to $41.25.

On the 17th of February, 1881, the Maryland Life Insurance Company of Baltimore issued, at Baltimore, a policy of insurance upon the life of Thomas L. Hume, in the sum of $10,000, for the term of his natural life, payable in the city of Baltimore to " the said insured, Annie G. Hume, for her sole use, her executors, administrators, or assigns;" the said policy being issued, as it recites on its face, in consideration of the sum of $337.20 to them duly paid by said Annie G. Hume, and of an annual premium of the same amount to be paid each year during the continuance of the policy. The application for this policy was signed " Annie G. Hume, by Thomas L. Hume," as is a recognized usage in such applications and in accordance with instructions to that effect printed upon the policy.

The charter of the Maryland Life Insurance Company pro-

vides as follows: "Section 17. That it shall be lawful for any married woman, by herself or in her name or in the name of any third person, with his consent, as her trustee, to cause to be insured in said company, for her sole use, the life of her husband, for any definite period or for the term of his natural life, and in case of her surviving her husband the sum or net amount of the insurance becoming due and payable by the terms of the insurance shall be payable to her to and for her own use, free from the claims of the representatives of her husband or of any of his creditors. In case of the death of the wife before the decease of the husband, the amount of the insurance may be made payable, after the death of the husband, to her children, or, if under age, to their guardian, for their use; in the event of there being no children, she may have power to devise, and if dying intestate, then to go [to] the next of kin."

The directions printed on the margin of the policy called especial attention to the provisions of the charter upon this subject; an extract from which was printed on the fourth page of the application. The amount of premium paid on this policy was $242.26, a loan having been deducted from the full premium of $337.20.

On the 13th of June, 1881, the Connecticut Mutual Life Insurance Company of Hartford, in consideration of an annual premium of $350.30, to be paid before the day of its date, issued a policy of insurance upon the life of Thomas L. Hume, in the sum of $10,000, for the term of his natural life, payable at Hartford, to Annie G. Hume and her children by him, or their legal representatives. The application for this policy was signed "Annie G. Hume, by Thomas L. Hume." It was expressly provided, as part of the contract, that the policy was issued and delivered at Hartford, in the State of Connecticut, and was "to be in all respects construed and determined in accordance with the laws of that State."

The "statute of Connecticut respecting policies of insurance issued for the benefit of married women" was printed upon the policy under that heading, and is as follows: "Any policy of life insurance expressed to be for the benefit of a married

woman, or assigned to her or in trust for her, shall inure to her separate use, or, in case of her decease before payment, to the use of her children or of her husband's children, as may be provided in such policy: *Provided*, That, if the annual premium on such policy shall exceed three hundred dollars, the amount of such excess, with interest, shall inure to the benefit of the creditors of the person paying the premiums; but if she shall die before the person insured, leaving no children of herself or husband, the policy shall become the property of the person who has paid the premiums, unless otherwise provided in such policy;" and this extract from the statute was printed upon the policy and attention directed thereto. From the $350.30 premium the sum of $105 was deducted, to be charged against the policy in accordance with its terms, with interest, and $245.30 was therefore the sum paid.

The American Life Insurance and Trust Company of Philadelphia, had also issued a policy in the sum of $5000 on the life of Hume, payable to himself or his personal representatives, and this was collected by his administrators.

Thomas L. Hume died at Washington on the 23d of October, 1881, insolvent, his widow, Annie G. Hume, and six minor children surviving him.

November 2d, 1881, the Central National Bank of Washington, as the holder of certain promissory notes of Thomas L. Hume, amounting to several thousand dollars, filed a bill in the Supreme Court of the District of Columbia against Mrs. Hume and the Maryland Life Insurance Company, the case being numbered 7906, alleging that the policy issued by the latter was procured while Hume was insolvent; that Hume paid the premium of $242.26 without complainant's knowledge or consent, and for the purpose of hindering, delaying, and defrauding the complainant and his other creditors; and praying for a restraining order on the insurance company from paying to, and Mrs. Hume from receiving, either for herself or children, the amount due pending the suit, and " that the amount of the said insurance policy may be decreed to be assets of said Thomas L. Hume applicable to the payment of debts owing by him at his death," etc. The temporary injunction was granted.

On the 12th of November, the insurance company filed its answer to the effect that Mrs. Hume obtained the insurance in her own name, and was entitled under the policy to the amount thereof, and setting up and relying upon the 17th section of its charter, quoted above. Mrs. Hume answered, November 16, declaring that she applied for and procured the policy in question, and that it was not procured with fraudulent intent; that the estate of her father, A. H. Pickrell, who died in 1879, was the largest creditor of Hume's estate; that she is her father's residuary legatee; that the amount of the policy was intended not only to provide for her, but also to secure her against loss; that her mother had furnished Hume with about a thousand dollars annually to be used for her best interests and that of his wife and children; and that the premium paid on the policy in question and those paid on other policies was and were paid out of money belonging to her father's estate, or out of the money of her mother applied as directed and requested by the latter.

Benjamin U. Keyser, receiver, holding unpaid notes of Hume, was allowed, by order of court, November 16, 1881, to intervene as cocomplainant in the cause.

R. Ross Perry and Reginald Fendall were appointed, November 26, 1881, Hume's administrators.

On January 23, 1882, the administrators filed three bills (and obtained injunctions) against Mrs. Hume and each of the other insurance companies, being cases numbered 8011, 8012 and 8013, attacking each of the policies (except the American) as a fraudulent transfer by an insolvent of assets belonging to his creditors.

The answers of Mrs. Hume were substantially the same *mutatis mutandis* as above given, and so were the answers of the Connecticut Mutual and the Virginia Life, the former pleading the statute of Connecticut as part of its policy and the latter the 7th section of its charter.

The Hartford Life and Annuity Company did not answer, and the bill to which it was a party defendant was taken *pro confesso*.

The administrators were, by order of court, January 2, 1883,

admitted parties defendant to said first case numbered 7906, and cases numbered 8011, 8012 and 8013 were consolidated with that case.

January 4, 1883, the court entered a decretal order, dissolving the restraining order in original cause numbered 8012, and directing the Virginia Insurance Company to pay the amount due upon its policy into court, and the clerk of the court to pay the same over to Mrs. Hume, for her own benefit and as guardian of her children, (which was done accordingly,) and continuing the injunctions in original causes 8011, 8013 and 7906, but ordering the other insurance companies to pay the amounts due into the registry of the court.

By order of court, January 30, 1883, the Farmers' and Mechanics' National Bank of Georgetown, which had proved up a large claim against Hume's estate, was allowed to intervene in original cause No. 7906 as a cocomplainant; and March 19, 1883, George W. Cochran, a creditor, was by like order allowed to intervene as cocomplainant in the consolidated cases.

Replications were filed and testimony taken on both sides.

The evidence tends to show that Hume's financial condition as early as 1874 was such that if called upon to respond on the instant, he could not have met his liabilities, and that this condition grew gradually worse until it culminated in irretrievable ruin in the fall of 1881; but it also indicates that for several years, and up to October 21st, 1881, two days before his death, he was a partner in a going concern, apparently of capital and credit; that he had a considerable amount of real estate, though most of it was heavily encumbered; that he was an active business man, not personally extravagant; and that he was, for two years prior to October, in receipt of moneys from his wife's mother, who had an income from her separate property.

He seems to have received from Mrs. Pickrell, or the estate of Pickrell, his wife's father, of which Mrs. Hume was the residuary legatee, over six thousand dollars in 1879, over three thousand dollars in 1880, and over seventeen hundred dollars in 1881.

Mrs. Pickrell's fixed income was one thousand dollars a year from rents of her own property, which, after the death of her husband in May, 1879, was regularly paid over to Mr. Hume. She testifies that she told Hume that "he could use all that I [she] had for his own and his family's benefit, and that he could use it for anything he thought best;" that she had out of it herself from $200 to $250 a year from the death of Pickrell, in May, 1879, to that of Hume in October, 1881, and that before his death Mr. Hume informed his wife and herself that he had insured his life for Mrs. Hume's benefit, but did not state where the premium money came from.

Blackford, agent for the Maryland company, testified, under objection, that Hume told him in February, 1881, that certain means had been placed in his hands, to be invested for his wife and children, and he had concluded to take $10,000 in Blackford's agency, and should, some months later, take $10,000 in the Connecticut Mutual. He accordingly took the $10,000 in the Maryland, and subsequently, during the summer, informed Blackford that he had obtained the insurance in the Connecticut Mutual.

Evidence was also adduced that Mr. Hume was largely indebted to Pickrell's estate, by reason of indorsements of his paper by Pickrell, and the use by him in raising money of securities belonging to the latter, and that said estate is involved in litigation and its ultimate value problematical.

The causes were ordered to be heard in the first instance at a general term of the Supreme Court of the District of Columbia, which court, after argument, on the fifth day of January, 1885, decreed that the administrators should recover all sums paid by Thomas L. Hume as premiums on all said policies, including those on the Virginia policy from 1874, and that after deducting said premiums the residue of the money paid into court (being that received from the Maryland and the Connecticut Mutual) be paid to Mrs. Hume individually or as guardian for herself and children, and that the Hartford Life and Annuity Company pay over to her the amount due on the certificates issued by it.

From this decree the said Central National Bank, Benjamin

U. Keyser, the Farmers' and Mechanics' National Bank of Georgetown, George W. Cochran, and the administrators, as well as Mrs. Hume, appealed to this court, and the cause came on to be heard here upon these cross-appeals.

*Mr. R. Ross Perry*, with whom was *Mr. Reginald Fendall* on the brief for the administrators, to the point that an insolvent debtor cannot by insuring his life with money of his creditors secure the payment of the proceeds of the insurance to his wife and children, cited: *Sims* v. *Thomas*, 12 Ad. & El. 536; *Norcutt* v. *Dodd*, 1 Cr. & Ph. 100; *Bayard* v. *Hoffman*, 4 Johns. Ch. 450; *Schondler* v. *Wace*, 1 Campb. 487; *Graves* v. *Dolphin*, 1 Sim. 66; *Brandon* v. *Robinson*, 18 Ves. 428; *Green* v. *Spicer*, 1 Russ. & Myl. 395; *Piercy* v. *Roberts*, 1 Myl. & K. 4; *Skarf* v. *Soulby*, 1 Macn. & Gord. 364; *Penhall* v. *Elwin*, 1 Sm. & Gif. 258, 267; *French* v. *French*, 6 De G., M. & G. 95; *Jenkyn* v. *Vaughan*, 3 Drewry, 419; *Neale* v. *Day*, 28 L. J. (N. S.) Ch. 45; *Stokoe* v. *Cowan*, 29 Beavan, 637; *Freeman* v. *Pope*, L. R. 5 Ch. 538; *Taylor* v. *Coenen*, 1 Ch. D. 636; *Rison* v. *Wilkerson*, 3 Sneed, 565; *Catchings* v. *Manlove*, 39 Mississippi, 655; *Appeal of Elliott's Executors*, 50 Penn. St. 75; *S. C.* 88 Am. Dec. 525; *Anderson's Estate, Hay's and Kerr's Appeals*, 85 Penn. St. 202; *Stokes* v. *Coffey*, 8 Bush, 533; *Thompson* v. *Cundiff*, 11 Bush, 567; *Hathaway* v. *Sherman*, 61 Maine, 466, 475; *Anthracite Ins. Co.* v. *Sears*, 109 Mass. 383; *Pence* v. *Makepeace*, 65 Indiana, 345, 360; *Stigler's Executor* v. *Stigler*, 77 Virginia, 163; *Hearing's Succession*, 26 La. Ann. 326.

*Mr. Walter D. Davidge* also filed a separate brief on behalf of the administrators and creditors.

*Mr. Enoch Totten*, with whom was *Mr. J. Holdsworth Gordon* on the brief for Mrs. Hume, to the point that the purchase of a policy of insurance issued on the life of a husband, who is insolvent, payable to the wife or to the wife and children, is not fraudulent as to creditors, cited: *Bank* v. *Hume*, 3 Mackey, 360, 384; *Succession of Constance Hearing*, 26 La. Ann. 326; *Goodrich* v. *Treat*, 3 Colorado, 408; *Elliott's Ap*

*peal,* 50 Penn. St. 75; *S. C.* 88 Am. Dec. 525; *Pence v. Make-peace,* 65 Indiana, 345; *Ætna Bank v. United States Life Ins. Co.,* 24 Fed. Rep. 770; *Stigler v. Stigler,* 77 Virginia, 163; *Woodworth v. Sweet,* 51 N. Y. 8; *Syracuse Chilled Plough Co. v. Wing,* 85 N. Y. 421; *Hyde v. Powell,* 47 Mich. 156; *Smith v. Seiberling,* 35 Fed. Rep. 677; *Anderson's Appeal,* 85 Penn. St. 202; *McCutcheon's Appeal,* 99 Penn. St. 133; *Thompson v. Cundiff,* 11 Bush, 567.

Mr. Chief Justice Fuller, after stating the case, delivered the opinion of the court.

No appeal was prosecuted from the decree of January 4, 1883, directing the amount due upon the policy issued by the Life Insurance Company of Virginia to be paid over to Mrs. Hume for her own benefit and as guardian of her children, nor is any error now assigned to the action of the court in that regard. Indeed, it is conceded by counsel for the complainants, that this contract was perfectly valid as against the world, but it is insisted that, assuming the proof to establish the insolvency of Hume in 1874 and thenceforward, the premiums paid in that and the subsequent years on this policy belonged in equity to the creditors, and that they were entitled to a decree therefor as well as for the amount of the Maryland and Connecticut policies and the premiums paid thereon.

It is not denied that the contract of the Maryland Insurance Company was directly between that company and Mrs. Hume, and this is, in our judgment, true of that of the Connecticut Mutual, while the Hartford company's certificates were payable to her, if living.

Mr. Hume having been insolvent at the time the insurance was effected, and having paid the premiums himself, it is argued that these policies were within the provisions of 13 Elizabeth, c. 5, and inure to the benefit of his creditors as equivalent to transfers of property with intent to hinder, delay and defraud. The object of the statute of Elizabeth was to prevent debtors from dealing with their property in any way to the prejudice of their creditors; but dealing with that

which creditors, irrespective of such dealing, could not have touched, is within neither the letter nor the spirit of the statute. In the view of the law, credit is extended in reliance upon the evidence of the ability of the debtor to pay, and in confidence that his possessions will not be diminished to the prejudice of those who trust him. This reliance is disappointed, and this confidence abused, if he divests himself of his property by giving it away after he has obtained credit. And where a person has taken out policies of insurance upon his life for the benefit of his estate, it has been frequently held that, as against creditors, his assignment, when insolvent, of such policies, to or for the benefit of wife and children, or either, constitutes a fraudulent transfer of assets within the statute, and this, even though the debtor may have had no deliberate intention of depriving his creditors of a fund to which they were entitled, because his act has in point of fact withdrawn such a fund from them, and dealt with it by way of bounty. *Freeman* v. *Pope*, L. R. 9 Eq. 206; *S. C.* L. R. 5 Ch. 538. The rule stands upon precisely the same ground as any other disposition of his property by the debtor. The defect of the disposition is that it removes the property of the debtor out of the reach of his creditors. *Cornish* v. *Clark*, L. R. 14 Eq. 184, 189.

But the rule applies only to that which the debtor could have made available for payment of his debts. For instance, the exercise of a general power of appointment might be fraudulent and void under the statute, but not the exercise of a limited or exclusive power, because, in the latter case, the debtor never had any interest in the property himself which could have been available to a creditor, or, by which he could have obtained credit. May on Fraudulent Conveyances, 33. It is true that creditors can obtain relief in respect to a fraudulent conveyance where the grantor cannot, but that relief only restores the subjection of the debtor's property to the payment of his indebtedness as it existed prior to the conveyance.

A person has an insurable interest in his own life for the benefit of his estate. The contract affords no compensation to him, but to his representatives. So the creditor has an in-

surable interest in the debtor's life, and can protect himself accordingly, if he so chooses. Marine and fire insurance is considered as strictly an indemnity ; but while this is not so as to life insurance, which is simply a contract, so far as the company is concerned, to pay a certain sum of money upon the occurrence of an event which is sure at some time to happen, in consideration of the payment of the premiums as stipulated, nevertheless the contract is also a contract of indemnity. If the creditor insures the life of his debtor he is thereby indemnified against the loss of his debt by the death of the debtor before payment ; yet, if the creditor keeps up the premiums, and his debt is paid before the debtor's death, he may still recover upon the contract, which was valid when made, and which the insurance company is bound to pay according to its terms; but if the debtor obtains the insurance on the insurable interest of the creditor, and pays the premiums himself, and the debt is extinguished before the insurance falls in, then the proceeds would go to the estate of the debtor. *Knox* v. *Turner*, L. R. 9 Eq. 155.

The wife and children have an insurable interest in the life of the husband and father, and if insurance thereon be taken out by him and he pays the premiums and survives them, it might be reasonably claimed in the absence of a statutory provision to the contrary, that the policy would inure to his estate.

In *Continental Life Ins. Co.* v. *Palmer*, 42 Conn. 60, 64, the wife insured the life of the husband, the amount insured to be payable to her if she survived him, if not, to her children. The wife and one son died prior to the husband, the son leaving a son surviving. The court held that under the provisions of the statute of that State, the policy being made payable to the wife and children, the children immediately took such a vested interest in the policy, that the grandson was entitled to his father's share, the wife having died before the husband, but that in the absence of the statute " it would have been a fund in the hands of his representatives for the benefit of creditors, provided the premiums had been paid by him." So in the case of *Anderson's Estate, Hay's and Kerr's Appeal*, 85 Penn. St. 202, A. insured his life in favor of his wife, who

died intestate in his lifetime, leaving an only child. A. died intestate and insolvent, the child surviving, and the court held that the proceeds of the policy belonged to the wife's estate, and, under the intestate laws, was to be distributed share and share alike between her child and her husband's estate, notwithstanding under a prior statute, life insurance taken out for the wife vested in her free from the claims of the husband's creditors. But if the wife had survived she would have taken the entire proceeds.

We think it cannot be doubted that in the instance of contracts of insurance with a wife or children, or both, upon their insurable interest in the life of the husband or father, the latter, while they are living, can exercise no power of disposition over the same without their consent, nor has he any interest therein of which he can avail himself, nor upon his death have his personal representatives or his creditors any interest in the proceeds of such contracts which belong to the beneficiaries to whom they are payable.

It is indeed the general rule that a policy, and the money to become due under it, belong, the moment it is issued, to the person or persons named in it as the beneficiary or beneficiaries, and that there is no power in the person procuring the insurance by any act of his, by deed or by will, to transfer to any other person the interest of the person named. Bliss on Life Insurance, 2d ed. p. 517; *Glanz* v. *Gloeckler*, 10 Appellate Court Illinois, 484, per McAllister, J.; *S. C.* 104 Illinois, 573; *Wilburn* v. *Wilburn*, 83 Indiana, 55; *Ricker* v. *Charter Oak Ins. Co.*, 27 Minnesota, 193; *Charter Oak Life Ins. Co.* v. *Brant*, 47 Missouri, 419; *Gould* v. *Emerson*, 99 Mass. 154; *Knickerbocker Life Ins. Co.* v. *Weitz*, 99 Mass. 157.

This must ordinarily be so where the contract is directly with the beneficiary; in respect to policies running to the person insured, but payable to another having a direct pecuniary interest in the life insured; and where the proceeds are made to inure by positive statutory provisions.

Mrs. Hume was confessedly a contracting party to the Maryland policy; and as to the Connecticut contracts, the statute of the State where they were made and to be per-

formed, explicitly provided that a policy for the benefit of a married woman shall inure to her separate use or that of her children, but if the annual premium exceed three hundred dollars, the amount of such excess shall inure to the benefit of the creditors of the person paying the premiums.

The rights and benefits given by the laws of Connecticut in this regard are as much part of these contracts as if incorporated therein, not only because they are to be taken as if entered into there, but because there was the place of performance, and the stipulation of the parties was made with reference to the laws of that place.

And if this be so as between Hume and the Connecticut companies, then he could not have at any time disposed of these policies without the consent of the beneficiary. Nor is there anything to the contrary in the statutes or general public policy of the District of Columbia.

It may very well be that a transfer by an insolvent of a Connecticut policy, payable to himself or his personal representatives, would be held invalid in that District, even though valid under the laws of Connecticut, if the laws of the District were opposed to the latter, because the positive laws of the domicil and the forum must prevail; but there is no such conflict of laws in this case in respect to the power of disposition by a person procuring insurance payable to another.

The obvious distinction between the transfer of a policy taken out by a person upon his insurable interest in his own life, and payable to himself or his legal representatives, and the obtaining of a policy by a person upon the insurable interest of his wife and children, and payable to them, has been repeatedly recognized by the courts.

Thus in *Elliott's Appeal,* 50 Penn. St. 75, 83, where the policies were issued in the name of the husband, and payable to himself or his personal representatives, and while he was insolvent were by him transferred to trustees for his wife's benefit, the Supreme Court of Pennsylvania, while holding such transfers void as against creditors, say :

"We are to be understood in thus deciding this case that we do not mean to extend it to policies effected without fraud

directly and on their face for the benefit of the wife, and payable to her; such policies are not fraudulent as to creditors, and are not touched by this decision."

In the use of the words "without fraud," the court evidently means actual fraud participated in by all parties, and not fraud inferred from the mere fact of insolvency; and, at all events, in *McCutcheon's Appeal*, 99 Penn. St. 133, 137, the court say, referring to Elliott's appeal:

"The policies in that case were effected in the name of the husband, and by him transferred to a trustee for his wife at a time when he was totally insolvent. They were held to be valuable choses in action, the property of the assured, liable to the payment of his debts, and hence their voluntary assignment operated in fraud of creditors, and was void as against them under the statute of 13th Elizabeth. Here, however, the policy was effected in the name of the wife, and in point of fact was given under an agreement for the surrender of a previous policy for the same amount also issued in the wife's name. . . . The question of good faith or fraud only arises in the latter case; that is, when the title of the beneficiary arises by assignment. When it exists by force of an original issue in the name, or for the benefit of the beneficiary, the title is good, notwithstanding the claims of creditors. . . . There is no anomaly in this, nor any conflict with the letter or spirit of the statute of Elizabeth, because in such cases the policy would be at no time the property of the assured, and hence no question of fraud in its transfer could arise as to his creditors. It is only in case of the assignment of a policy that *once belonged* to the assured that the question of fraud can arise under this act."

And see *Ætna National Bank* v. *United States Life Ins. Co.*, 24 Fed. Rep. 770; *Pence* v. *Makepeace*, 65 Indiana, 374; *Succession of Hearing*, 26 La. Ann. 326; *Stigler's Ex'r* v. *Stigler*, 77 Virginia, 163; *Thompson* v. *Cundiff*, 11 Bush, 567.

Conceding, then, in the case in hand, that Hume paid the premiums out of his own money, when insolvent, yet, as Mrs. Hume and the children survived him, and the contracts covered

their insurable interest, it is difficult to see upon what ground the creditors, or the administrators as representing them, can take away from these dependent ones that which was expressly secured to them in the event of the death of their natural supporter.    The interest insured was neither the debtor's nor his creditors'.    The contracts were not payable to the debtor, or his representatives, or his creditors.    No fraud on the part of the wife, or the children, or the insurance company is pretended.    In no sense was there any gift or transfer of the debtor's property, unless the amounts paid as premiums are to be held to constitute such gift or transfer.    This seems to have been the view of the court below; for the decree awarded to the complainants the premiums paid to the Virginia company from 1874 to 1881, inclusive, and to the other companies from the date of the respective policies, amounting, with interest to January 4, 1883, to the sum of $2696.10, which sum was directed to be paid to Hume's administrators out of the money which had been paid into court by the Maryland and Connecticut Mutual companies.

But, even though Hume paid this money out of his own funds when insolvent, and if such payment were within the statute of Elizabeth, this would not give the creditors any interest in the proceeds of the policies, which belonged to the beneficiaries for the reasons already stated.

Were the creditors, then, entitled to recover the premiums?

These premiums were paid by Hume to the insurance companies, and to recover from them would require proof that the latter participated in the alleged fraudulent intent, which is not claimed.    Cases might be imagined of the payment of large premiums, out of all reasonable proportion to the known or reputed financial condition of the person paying, and under circumstances of grave suspicion, which might justify the inference of fraud on creditors in the withdrawal of such an amount from the debtor's resources; but no element of that sort exists here.

The premiums form no part of the proceeds of the policies, and cannot be deducted therefrom on that ground.

Mrs. Hume is not shown to have known of or suspected her

husband's insolvency, and if the payments were made at her instance, or with her knowledge and assent, or if, without her knowledge, she afterwards ratified the act, and claimed the benefit, as she might rightfully do, *Thompson* v. *Amer. Ins. Co.*, 46 N. Y. 674, and as she does (and the same remarks apply to the children), then has she thereby received money which *ex æquo et bono* she ought to return to her husband's creditors, and can the decree against her be sustained on that ground?

If in some cases payments of premiums might be treated as gifts inhibited by the statute of Elizabeth, can they be so. treated here?

It is assumed by complainants that the money paid was derived from Hume himself, and it is therefore argued that to that extent his means for payment of debts were impaired. That the payments contributed in any appreciable way to Hume's insolvency, is not contended. So far as premiums were paid in 1880 and 1881, (the payments prior to those years having been the annual sum of $196.18 on the Virginia policy,) we are satisfied from the evidence that Hume received from Mrs. Pickrell, his wife's mother, for the benefit of Mrs. Hume and her family, an amount of money largely in excess of these payments, after deducting what was returned to Mrs. Pickrell, and that in paying the premiums upon procuring the policies in the Maryland and the Connecticut Mutual, Hume was appropriating to that purpose a part of the money which he considered he thus held in trust, and we think that, as between Hume's creditors and Mrs. Hume, the money placed in Hume's hands for his wife's benefit, is under the evidence, equitably as much to be accounted for to her by Hume, and so by them, as is the money paid on her account to be accounted for by her to him or them.

We do not, however, dwell particularly upon this, nor pause to discuss the bearing of the laws of the States of the insurance companies upon this matter of the payment of premiums by the debtor himself, so far as they may differ from the rule which may prevail in the District of Columbia, in the absence of specific statutory enactment upon that subject, because we prefer to place our decision upon broader grounds.

In all purely voluntary conveyances it is the fraudulent intent of the donor which vitiates. If actually insolvent, he is held to knowledge of his condition; and if the necessary consequence of his act is to hinder, delay, or defraud his creditors, within the statute, the presumption of the fraudulent intent is irrebuttable and conclusive, and inquiry into his motives is inadmissible.

But the circumstances of each particular case should be considered, as in *Partridge* v. *Gopp,* 1 Eden, 163, 168; *S. C.* Ambler, 596, 599, where the Lord Keeper, while holding that debts must be paid before gifts are made, and debtors must be just before they are generous, admitted that "the fraudulent intent is to be collected from the magnitude and value of the gift."

Where fraud is to be imputed, or the imputation of fraud repelled, by an examination into the circumstances under which a gift is made to those towards whom the donor is under natural obligation, the test is said, in *Kiff* v. *Hanna,* 2 Bland, 33, to be the pecuniary ability of the donor at that time to withdraw the amount of the donation from his estate without the least hazard to his creditors, or in any material degree lessening their then prospects of payment; and in considering the sufficiency of the debtor's property for the payment of debts, the probable, immediate, unavoidable, and reasonable demands for the support of the family of the donor should be taken into the account and deducted, having in mind also the nature of his business and his necessary expenses. *Emerson* v. *Bemis,* 69 Illinois, 541.

This argument in the interest of creditors concedes that the debtor may rightfully preserve his family from suffering and want. It seems to us that the same public policy which justifies this, and recognizes the support of wife and children as a positive obligation in law as well as morals, should be extended to protect them from destitution after the debtor's death, by permitting him, not to accumulate a fund as a permanent provision, but to devote a moderate portion of his earnings to keep on foot a security for support already, or which could thereby be lawfully obtained, at least to the extent of requir-

ing that, under such circumstances, the fraudulent intent of both parties to the transaction should be made out.

And inasmuch as there is no evidence from which such intent on the part of Mrs. Hume or the insurance companies could be inferred, in our judgment none of these premiums can be recovered.

*The decree is affirmed, except so far as it directs the payment to the administrators of the premiums in question and interest, and, as to that, is reversed, and the cause remanded to the court below, with directions to proceed in conformity with this opinion.*