13      15
35S     153

[No. 1525.]

## THE HENDRIE & BOLTHOFF MANUFACTURING CO. v. PLATT.

1. LIFE INSURANCE—HUSBAND AND WIFE—FRAUDULENT CONVEY-
ANCE.

The proceeds of policies of life insurance on the life of a husband for
the benefit of and payable to the wife are not subject to the debts
of the husband unless it be to the extent of premiums paid after
the debts were contracted, and during the husband's insolvency.

2. SAME.

Where a husband was indebted to his wife in a sum greater than the
amount of premiums paid on insurance on his life for the benefit
of his wife, the payments will be presumed to have been made in
payment of such indebtedness, and the creditors of the husband
would have no right to recover back such premiums notwithstand-
ing they were made during insolvency of the husband, and after the
debts were contracted.

3. SAME.

The fact that a policy of life insurance on a husband's life payable to
the wife was issued on the distributive plan, the distribution period
being at the end of twenty years, at which time if living the hus-
band had an option to apply the accumulated surplus to the pur-
chase of an annuity on his life or continue the policy for the original
amount and withdraw in cash the accumulated surplus apportioned
to it; or to withdraw in cash the entire equity, or to convert the en-
tire equity into a paid-up policy, did not make the proceeds of the
policy subject to the husband's debts, where he dies before the ex-
piration of the twenty years.

*Appeal from the District Court of Arapahoe County.*

Mr. R. D. THOMPSON and Mr. HARVEY RIDDELL, for ap-
pellant.

Mr. WESTBROOK S. DECKER, for appellee.

WILSON, J.

This is an action brought by a creditor of a deceased in-
solvent, for the purpose of subjecting to the payment of
the latter's debts the funds realized from life and accident

insurance taken and carried by the latter in favor and for the benefit of his wife, who is the defendant. James H. Platt died on August 13, 1894, and his estate was found to be insolvent.

The complaint charges that while insolvent, the said Platt carried upon his life and obtained life and accident insurance in favor of the defendant as follows, to wit: A policy of life insurance for $25,000 in the New York Life Insurance Company of New York, dated January 9, 1890, No. 344,968, with an annual premium of $1,540, payable annually. Another policy of life insurance for $15,000 in the New York Life Insurance Company of New York, dated June 29, 1893, No. 548,481, with a semi-annual premium of $391.20, payable semi-annually. Another policy of life insurance for $20,000 in the Massachusetts Benefit Association of Boston, Mass., dated, to wit, . . . . . . . . . . . . . , 1890, with an annual premium of $400, payable annually. Another policy of life insurance for $10,000 in the Provident Savings Life Assurance Society of New York, dated, to wit, A. D. 1887, with an annual premium of $275, payable annually. A policy of accident insurance for $10,000 in the Travelers Insurance Company of Hartford, Conn., dated, to wit, November 17, 1893, with an annual premium of $50.00, payable annually. Another policy of accident insurance for $10,000 in the Fidelity and Casualty Company of New York, dated, to wit, A. D. 1890, with an annual premium of $42.00, payable annually. Another policy of accident insurance for $5,000 in the Preferred Accident Insurance Company of New York, dated, to wit, about A. D. 1887, with an annual premium of $12.00 per annum, payable annually. Another policy of accident insurance for $5,000 of the United States Mutual Accident Association of New York, dated about A. D. 1887, with an annual premium of $15.00 per annum, payable annually. Another policy of accident insurance for $10,000 of the Standard Accident Insurance Company of Michigan, dated about December, 1892, with an annual premium of $42.00, payable annually. That all of said insurance has been paid to

the defendant; that at the times during which the indebtedness to plaintiff was incurred, and while the assured was insolvent, he paid out of his own means and money the premiums on the policies taken out prior to said indebtedness, and that "said payments were made for the purpose of placing so much of his means, also the moneys, that upon his death should be payable to this defendant, under the said policies, beyond the reach of this plaintiff, for the purpose of hindering and delaying and defrauding this plaintiff in the collection of the moneys owing them." That the moneys advanced for premiums on the policies between May 27, 1893, and May 31, 1894, were taken from the capital and business of said Platt, and impaired his ability to meet his just debts, and tended to impair the successful operation of said business, as he, the said Platt, and this defendant, well knew.

The answer of the defendant denied, *inter alia*, that any insurance was effected or any premiums paid during the insolvency of the assured, and alleged that at all the times of such payments he was wholly solvent. The answer further alleges that at the time of his death the deceased was indebted to defendant in a large sum of money, which she had loaned to him about the time of their marriage in 1884, long prior to the contracting of this indebtedness and to any charge of insolvency, and that to insure her against the loss of said money, and also for her support and the support of their children, the deceased had agreed to keep his life fully insured in her behalf.

It appeared upon the trial that the policy of insurance for $10,000 in the Provident Savings Life Assurance Society of New York was not in favor of the defendant, but that the beneficiary therein was one Sarah A. Keeney, who was a creditor of the decedent, and who had collected the insurance due upon the policy, and after deducting therefrom the amount of the debt owing to her, had paid the balance to the defendant as executrix, and that the same had been accounted for to the estate of the decedent. This balance, amounting to something over $6,000, was credited by the defendant to the

estate, and applied to the payment of its debts, she therefore receiving no benefit from it. This policy is therefore eliminated from the consideration of this case. Excluding this, it will be seen that the amount received by defendant on account of life policies was $60,000, the policies on $45,000 of which had been taken in 1890, long prior to the contracting of the indebtedness to plaintiff and to any attempted proof of insolvency. On account of policies for accident insurance, the defendant received $40,000, the policies for all of which except $10,000 were issued long prior to the indebtedness to plaintiff. The annual premiums required to be paid on all the policies was in the aggregate about $2,500, of which $161 paid the annual premiums on all of the accident policies. At the time when this insurance was effected, there were dependent upon the deceased for support his wife, the defendant, and two daughters, one the child of a former marriage.

The questions presented for determination are those of first impression in this jurisdiction, and it is scarcely necessary to say, are also of first importance. Impressed with this fact, the court has given to them the most thorough consideration, examination and study, in which work we have been most materially aided by the able, thorough and exhaustive arguments of counsel on both sides.

In the examination of the question as to how far, in the absence of statute, the fund realized from insurance upon the life of an insolvent debtor can be made chargeable with his debts, we are not aided by a very large number of authorities upon the direct proposition. There are, however, a number of well considered cases in which the question in its varying phases as presented has been considered and determined. The absence of a great number of cases bearing upon the question may be accounted for by the fact that in the great majority of states the question is expressly regulated by statute. In this state, however, there is no statute except in regard to insurance on the assessment plan. As to the fund realized from this character of insurance only it is provided

by the statute that it shall not be liable for the debt of any certificate holder or beneficiary named therein. Laws, 1887, p. 289, sec. 10.

By the authorities which have adjudicated the question independent of statute, we find three distinct propositions announced. First, that in the absence of actual fraud, the fund derived from insurance upon his own life by an insolvent debtor in favor of his wife or child or children, dependent upon him, cannot be reached by his creditors, and made subject to the payment of his debts, except possibly in certain contingencies which we will hereafter discuss, the amount of the premiums paid by the insolvent debtor during insolvency. In support of this doctrine either in whole or in part are: *Bank v. Hume*, 128 U. S. 195; *Appeal of Elliott's Executors*, 50 Pa. 75; *Bank v. U. S. Life Ins. Co. et al.*, 24 Fed. Rep. 770; *Bank v. Hume*, 3 Mackey, 360; *Anderson's Estate*, 85 Pa. St. 202; *Pence, Admr., v. Makepeace*, 65 Ind. 345; *Pinneo v. Goodspeed*, 120 Ill. 536; *State ex rel. Wright v. Tomlinson*, 45 N. E. Rep. (Ind. App.) 1120; *Holmes v. Gilman*, 138 N. Y. 369; *Stigler v. Stigler*, 77 Va. 77; 2 Bigelow, Frauds, p. 129. To this effect in principle are also, *Forrester v. Gill*, 11 Colo. App. 410, and *McLean v. Hess et al.*, 106 Ind. 555.

Another doctrine supported by some authority is that the procurement of such insurance by an insolvent is a voluntary conveyance or gift which is void as to existing creditors, though no fraud may have been intended, and that the whole of the insurance would be subject to the debts of the assured. The principal authorities in support of this doctrine to which we have been cited seem to be *Fearn v. Ward*, 80 Ala. 555, *Transportation Co. v. Borland*, 53 N. J. Eq. 282, and *Stokes v. Coffey*, 8 Bush, 533. Another line of authorities hold that in such cases the amount of the premiums paid by the insolvent and that alone of the proceeds can be reached by his creditors. We think that the weight of authority is in favor of the doctrine announced by the first line of authorities, and that it is better sustained upon reason and upon principle.

The reasoning by which the courts holding to this view support their conclusions commends itself most highly to our judgment. In the first place, it is undoubtedly the law as held almost if not quite universally that the policy is the contract of insurance, and that the moment it is issued its ownership vests in the beneficiary. The applicant for it and he who paid the premium which secured it cannot thereafter change, assign, alienate or incumber it, or any rights to be secured under it upon compliance with its provisions. He cannot even defeat it by a refusal to pay the subsequent premiums required, if the beneficiary or any person for her pays them. The contract is between the insurance company and the beneficiary. To this effect are the authorities above cited, and also numerous others to which reference might be made, including the following: *Wilburn v. Wilburn,* 83 Ind. 55; *Yore v. Booth,* 110 Cal. 238; *Ricker v. Insurance Co.,* 27 Minn. 193; Bliss on Life Insurance, § 318. The payments of subsequent premiums do not create new contracts, nor strictly speaking, do they constitute renewals of the insurance contract. They are simply the fulfillment of conditions required by the original contract, a failure to comply with which would work a forfeiture. Besides, the contract is based upon and its fruits finally realized if at all because of the insurable interest of the beneficiary in the life of the assured. The latter is equally as essential and is equally an important consideration of the contract. Upon what principle or theory then can it be said that rights based upon this insurable interest, which is an interest or right purely personal to the beneficiary, can inure to the benefit of the creditors of the assured? Can they say to the wife, though it is true that this fund was realized upon your insurable interest in the life of your husband, not upon his interest in his own life nor upon our interest in it as creditors, yet because he paid the cash premiums required while insolvent, we should subject to the payment of our debts, not only so much of the fund as equals the amount of premiums so paid, which is all he took from his estate and all of which he

deprived us, but we will take the whole fund? We will take back that which he took from us, and also that which could not have been secured without your insurable interest in his life? The questions, in our opinion, suggest their own answer.

Again, the fund, which is the property against which the creditors seek to enforce their claims, has not come into existence, has not become property till after the death of the debtor. How then can it be said that he made a voluntary or fraudulent conveyance of that which did not exist during his life? If a creditor's rights would attach to any portion of the proceeds of the insurance, would it not be more reasonable to say that in such case, the right of recovery would be limited to the amount of funds so diverted, which in this instance would be the aggregate amount of premiums paid by the insolvent debtor? This would be what he gave to or voluntarily expended for the benefit of his wife. The fund realized by her was not from the payment of the premiums only, but from and by reason of, in addition thereto, her insurable interest in his life, which he neither gave nor conveyed to her, and in which he had no interest. In this state, a married woman has a right to acquire, hold, manage and convey her own separate property, free from any claim of her husband or of his creditors. · Suppose that an insolvent husband should give to his wife $1,000, and that such a gift was under such circumstances as to make it manifestly fraudulent against his creditors, and suppose that his wife by prudent management of the money and by successful speculation should in course of time acquire property of the value of $5,000. Could it be successfully contended that the husband's creditors could enforce their claims against this property to the full extent of its value? Obviously not. Certainly, in the absence of actual fraud upon the part of the wife, their right would be limited to the amount of the original money gift with interest. This was what he gave in fraud of the creditors,—this is what he took from them. It became none the less her absolute property because she might afterwards

be compelled to repay it, and upon no principle of either law or justice could she be required to answer to her husband's creditors for its accretions while it was her property. All which the creditors could have demanded from the debtor was the amount of the gift had he retained it, and certainly this was all which they could demand from the donee or grantee. Upon precisely the same principle it would seem clear that the proceeds of life insurance effected in favor of an insolvent debtor's wife could be chargeable, if at all, with his debts only to the extent that he, while insolvent, had used the funds of his estate to secure and carry the insurance. The contrary might be urged with some force if the insurance arose from a policy taken out by the debtor in favor of his own estate,—payable to his executors, administrators, or assigns, and which had afterwards, during insolvency, been assigned to his wife. This question does not, however, arise in this case. In each of the policies here in question, the wife of the assured was expressly designated as the sole beneficiary.

In *Bank v. Hume*, 128 U. S. *supra*, Chief Justice Fuller, speaking for a unanimous court, said, *inter alia*, "Mr. Hume having been insolvent at the time the insurance was effected, and having paid the premiums himself, it is argued that these policies were within the provisions of 13 Elizabeth, chapter 5, and inure to the benefit of his creditors as equivalent to transfers of property with intent to hinder, delay and defraud. The object of the statute of Elizabeth was to prevent debtors from dealing with their property in any way to the prejudice of their creditors, but dealing with that which creditors, irrespective of such dealing, could not have touched, is within neither the letter nor the spirit of the statute. In the view of the law, credit is extended in reliance upon the ability of the debtor to pay, and in confidence that his possessions will not be diminished to the prejudice of those who trust him. This reliance is disappointed, and this confidence abused, if he divests himself of his property by giving it away after he had obtained credit. And where a person has taken out poli-

cies of insurance upon his life for the benefit of his estate, it has been frequently held that, as against creditors, his assignment, when insolvent, of such policies, to or for the benefit of wife and children, or either, constitutes a fraudulent transfer of assets within the statute, and this, even though the debtor may have no deliberate intention of depriving his creditors of a fund to which they are entitled because his act has in point of fact withdrawn such a fund from them, and dealt with it by way of bounty. *Freeman v. Pope*, L. R. 9 Eq. 206.

" The rule stands upon precisely the same grounds as any other disposition of his property by the debtor; the defect of the disposition is that it removes the property of the debtor out of the reach of the creditors. *Cornish v. Clark*, L. R. 14 Eq. 184.

" But the rule applies only to that which the debtor could have made available for the payment of his debts. For instance, the exercise of a general power of appointment might be fraudulent and void under the statute, but not the exercise of a limited or exclusive power, because, in the latter case, the debtor never had any interest in the property himself which could have been available to a creditor, or by which he could have obtained credit. May on Fraudulent Conveyances, 33.

" It is true that creditors can obtain relief in respect to a fraudulent conveyance where the grantor cannot, but that relief only restores the subjection of the debtor's property to the payment of his indebtedness as it existed prior to the conveyance. * * * It is, indeed, the general rule that the policy and the money to become due under it apply the moment it is issued to the person or persons named in it as the beneficiary or beneficiaries, and that there is no power in the person procuring the insurance by any act of his, by deed or by will, to transfer to any other person the interest of the person named, * * * Conceding, then, in the case in hand, that Hume paid the premiums out of his own money when insolvent, yet as Mrs. Hume and the children survived him, and the con-

tracts covered their insurable interest, it is difficult to see upon what grounds the creditors—or the administrators as representing them—can take away from these dependent ones that which was expressly secured to them in the event of the death of their natural supporter. The interest was neither the debtor's nor the creditors'. The contracts were not payable to the debtor or his representatives or his creditors. No fraud on the part of the wife or the children or the insurance company is pretended. In no sense was there any gift or transfer of the debtor's property, unless the amounts paid as premiums are to be held to constitute such gift or transfer. * * * But even though Hume paid this money out of his own funds when insolvent, and if such payment were within the statute of Elizabeth, this would not give the creditors any interest in the proceeds of the policies, which belong to the beneficiaries for the reasons already stated."

Prior to its appeal to the supreme court of the United States, the same case was heard in the supreme court of the District of Columbia. That court in its opinion said : " But Mrs. Hume (the beneficiary) did not derive anything by assignment, nothing by transfer. What she claims under this policy never belonged to the estate of her husband, never formed an asset or a basis of credit. The proceeds of the policies stand entirely in a different relation to his estate from a contract directly with himself. He never had any control of them ; he never could assign or transfer them. The decisions point uniformly to the conclusion that the moment a policy of insurance is effected for the benefit of a wife upon the life of her husband, it becomes her property *eo nomine,* and nobody has control of it but herself. She may assign it unless there is some public policy against it, and it is just as much a vested right in the married woman as any other portion of her separate estate. * * * What right have the creditors to what never belonged to the estate ? What right have they to a vested right in the married woman for her protection and that of her family ? What right have they to a species of property that never existed until after the death of her

husband? We presume that no creditor of Thomas L. Hume would dare to stand up and make the statement that he had been misled by these policies, or that he had extended credit to him on their strength." In this case the assured was insolvent at the time the insurance was effected and the policies issued. In the case at bar, all of the policies save two were issued long prior to the time when there is any suggestion or evidence of the insolvency of the assured.

In *Elliott's Appeal, supra,* the question before the court was upon the disposition of the proceeds of a policy originally issued in the name of the husband and payable to himself or his personal representatives, and while insolvent transferred by him to trustees for his wife's benefit. The court held that this policy was properly a part of his estate, and that its transfer while insolvent was void as against creditors, but say, " We are to be understood in thus deciding this case that we do not mean to extend it to policies effected without fraud, directly and on their face for the benefit of the wife and payable to her. Such policies are not fraudulent as to the creditors, and are not touched by this decision."

In *McCutcheon's Appeal,* 99 Pa. St. 137, the court reaffirmed the doctrine announced in *Elliott's Appeal,* which we have quoted above. This case, it is true, was based largely upon the construction of a statute of the state with reference to the exemption of the proceeds of insurance, but the court held that independent of statute, in case the wife was the beneficiary named in the policy of insurance on the life of her husband, there was no conflict between the statute and the letter or spirit of the statute of Elizabeth. The court said, " There is no anomaly in this, nor any conflict with the letter or spirit of the statute of Elizabeth, because in such cases the policy would be at no time the property of the assured, and hence no question of fraud in its transfer could arise as to his creditors."

In *Pence v. Makepeace et al., supra,* the court said, " If, however, it were conceded—which we do not concede—that a creditor of the assured might in any case institute and main-

tain an action for the recovery of any part of the amount of the policy of insurance procured by the insolvent debtor upon his own life for the benefit of his wife or family, upon the grounds that the premiums therefor were paid with money which ought to have been applied to the payment of the debt of the assured to such creditor, and that such payment of such premiums by the assured was a fraud upon the rights of such creditor, we are clearly of the opinion that the very utmost which the creditor could possibly recover in such action would be the aggregate amount of the premiums thus paid.    The creditor could not in any event derive a profit from or recover aught more than the sums of money actually paid by the debtor in premiums upon a policy of insurance upon his own life, payable to or for the benefit of his wife, or any member of his family."

In support of the doctrine contrary to that held by this most respectable array of authorities, the two leading cases to which we are cited are *Transportation Co. v. Borland, supra,* and *Fearn v. Ward, supra.*   It would extend this opinion to an unwarrantable length and would serve no useful purpose to discuss in detail these opinions.   For the reasons which we have ourselves given, and for those advanced by the courts which we have followed, we think that the doctrine laid down in *Bank v. Hume,* and like cases, is more in accordance with law, reason and justice, and neither the statutes nor judicial precedents in this state being in conflict with it, we prefer to follow it.   We will only say that in reference to the New Jersey case, *Transportation Co. v. Borland, supra,* as the base of the argument is laid down the proposition that there can be no difference between the law applicable to the proceeds of a policy where an insolvent father pays the premiums upon a policy of insurance issued upon his life and payable to his child, and that of the proceeds of a policy originally issued in his own name, but assigned during insolvency to the child.   This doctrine, as we have seen, is contrary to the vast preponderance of authority.   In this case, too, the opinion was rendered upon a demurrer to the com-

plaint, which positively alleged that the payments of premiums were made by the assured insolvent debtor for the purpose of placing so much of his means beyond the reach of his creditors, and for the purpose of defrauding the complainant. The demurrer, of course, admitted the allegations of the complaint to be true.

In Alabama, at the time when *Fearn v. Ward* was determined, there was a statute which provided in effect that insurance on the life of a husband in favor of his wife should be exempt from claims of creditors to the extent only of the amount that an annual premium of $500 would purchase. Under this statute it had been held that if this limit was exceeded the statute intervened and devoted the excess of insurance to the payment of the assured's debts, on the ground that the statute fixed a limit beyond which the husband could not go in paying premiums from his own funds, which should be appropriated to his creditors. In *Fearn v. Ward* it was held that this judicial interpretation of the statute could be maintained only on the principle that without the statutory intervention and exemption the whole of the insurance would be subject to the payment of the debts of the husband. This would seem to have been considered by the court as a cogent reason in support of its conclusion.

We have also been cited to *Stokes & Son v. Coffey*, 8 Bush (Ky.), 533, as maintaining a doctrine contrary to that in *Bank v. Hume*. As to what was determined by the court in this case, we leave to the court itself as stated by it in a subsequent opinion, *Thompson v. Cundiff*, 11 Bush, 570. In its opinion in this case, the court says: " The right of a husband to make provision for his wife, even though he be insolvent and in debt, was left an open question by this court in the cases of *Doyle v. Sleeper*, 1 Dana, 532, and *Stokes & Son v. Coffey*, 8 Bush, 533."

We think it clear that the plaintiff in the case before us has no legal right to enforce a claim to the payment of its debt against the proceeds arising from any of the insurance upon the life of the deceased debtor, Col. Platt, unless it be to the

extent of the premiums paid by him subsequent to his becoming indebted to plaintiff, and during his insolvency, if insolvent at all, which latter question we will now consider.

There was no evidence tending to show or to raise any legal presumption of Col. Platt's insolvency prior to 1893, and hence our inquiry will be confined to the disposition of the premiums paid during the years 1893 and 1894. As to those paid during the previous years, this plaintiff can have no claim whatever. There was no evidence tending to show any fraudulent intent on the part of either Col. Platt or Mrs. Platt, in the payment of the premiums under consideration. Nor was the evidence sufficient to have supported a finding, considering the extensive business operations and large means of the assured, that these payments either caused his insolvency or that of his estate, if it occurred, or had any material or appreciable effect in bringing it about. Under these circumstances, the facts were not shown upon which the law would raise a presumption of fraudulent intent, rendering necessary an inquiry into their motives. We might with great confidence then say, in the absence of proof of fraudulent intent, that the amount of these premiums could not be reached by the creditors, because the case would come within the rule announced in *Bank v. Hume, supra.* Whilst this is the result of our conclusion, we prefer, however, to base our decision upon broader and if possible more indisputable grounds. It clearly appears from the evidence that at the time of the death of the assured, he was and had been for a number of years previous, prior to 1893, indebted to his wife, the defendant herein and the beneficiary in all of these policies of insurance, in a large sum of money. The chief dispute between the parties is as to the amount of this indebtedness. We do not propose to go into the merits of this controversy, because as will be seen from the view which we take of it, the precise amount is not material. We think it shown beyond a doubt that it was at least equal to about $30,000, a sum far more than sufficient to have paid all of the premiums during these two disputed years; in fact, more than to have

paid all of the premiums paid upon all of the policies of insurance. He had a legal right to prefer her as his creditor, and as between the parties we think she is at least equally entitled to the presumption that he was so preferring her. Conceding that he was insolvent during the years claimed, there was every inducement and reason for his so preferring her, when at the same time in addition thereto he would also be providing for the future support of her and his children after his death. Under the evidence, the money loaned or advanced by her to him is equitably as much to be accounted for to her by him as between his creditors and her, as is the money paid on her account to be accounted for by her. In fact, we think that her equitable rights are superior, because the evidence is undisputed that at the time she permitted him to become indebted to her, it was with the express agreement on his part that he would at all times keep his life insured in a sufficient amount not only to repay this indebtedness in full, but also to provide a fund for the support of herself and his children after his death. And further, the principle of public policy steps in and furnishes an additional reason. Where the rights of creditors and those growing out of the family relations are in conflict, and the equities between them evenly balanced, the latter are, to say the least, of equal dignity and respect. The state has a deep interest in seeing that families are not left in a destitute condition upon the death of the husband and father, and in having children properly educated and fitted to become respectable and self-supporting citizens. When, therefore, a husband takes out a policy of insurance for the benefit of his wife and family, such a provision is regarded as being of the most meritorious character, and the law universally recognizes that in so doing he has performed a social and moral duty. *Goodrich v. Street*, 3 Colo. 400; *Bank v. Hume*, 3 Mackey, *supra*. Indeed, it may be said in this state that he has fulfilled in principle at least a legal obligation. Here, the head of a family may be compelled to support his wife and children, and upon failure may be punished by imprisonment, and this too independent

of any considerations of his indebtedness.   The duty which he owes to his dependent family and to the state is of higher importance than that which he owes to his individual creditors.    This may almost be said to be a legislative recognition of the public policy to which we have referred.   We see no difference in principle between compelling the husband while living to support his wife and family, and in permitting him to make some provision for their support, to at least a reasonable extent, after his death.

But, say counsel, admitting that she was preferred as a creditor, she would equitably be entitled only to so much of the insurance fund as would discharge her debt and interest thereon, and the balance realized from the insurance should be accounted for by her to the estate of the decedent, and become charged with the payment of his other debts.    Without entering into discussion as to whether this is in all cases the true rule for the disposition of insurance proceeds where the life of a debtor has been insured for the benefit of a creditor, we say that the rule is not applicable to the facts of this case, nor, indeed, as broadly stated, to the facts of any case where the creditor was also the wife, or a member of the assured's family, whom he was legally and morally bound to support.    In such case, it will be assumed, unless there be some evidence to the contrary, that the insurance was carried for the double purpose of paying the debt and also to provide a fund for the support of the beneficiary.   An ordinary creditor is enabled to insure his debtor's life by virtue of his debt only.    It might then with much reason be claimed that his insurable interest is limited to the amount of the debt and a reasonable amount added for the expenses of procuring and carrying the insurance.    It could be urged with great force that to hold otherwise would in effect make the contract of insurance a wagering contract.    This reason does not prevail, however, where the creditor is also the wife of the assured or a dependent member of his family.    The insurable interest of such a person is not limited to any fixed amount.    Insurance in such case may be procured to any amount to which

the companies may be willing to contract, and however large it may be, it cannot be called a wagering contract. The law does not undertake to fix the amount beyond which a man shall not go in making provision for his dependent family. The reason of the rule, therefore, conceding it to be as contended for by plaintiff, fails when applied to such insurance as that here in question, and hence the rule falls with it. If any of the policies were by their terms made payable to defendant as a creditor, the contention of plaintiff as to the disposition of the proceeds of such might have some apparent force. This was not the case, however, with any one of them. It was specifically provided in all that they inured to the benefit of defendant as the wife of the assured. Even, however, if the rule were applicable to this case, it would avail the plaintiff nothing, because all of the insurance purchased by the premiums paid during the years 1893 and 1894, conceding that the assured was then insolvent, would not have been more than sufficient to have discharged the actual indebtedness to defendant as claimed by her.

It is insisted, however, by plaintiff that the amount of insurance carried by the deceased in favor of defendant was so large as to be unreasonable and to raise a presumption of fraud, whether viewed in the aspect of insurance carried for the benefit of a creditor, or of his wife and family, or of both and that it would be inequitable for her to retain all of the proceeds. We do not think so. The policies on which were realized three fourths of the whole amount received by defendant were taken out, and the title thereto had become vested in her, long prior to any pretense of Col. Platt's insolvency, and prior to any indebtedness by him to this plaintiff, and as to these it does not concern plaintiff whether the amount was large or small. If it had been three times as large as it was, we cannot see upon what principle a creditor, especially a subsequent creditor, could complain. Neither in the view which we take of this case will it avail plaintiff to make inquiry into the reasonableness of the amount of insurance secured by premiums paid by the assured during the two years

of his alleged insolvency.   He was indebted to defendant in a sum greater than the aggregate of the premiums so paid, and the presumption being, as we have held, that in making such payments he was preferring her as a creditor to that extent, she was entitled by virtue of her insurable interest in his life as his wife to all of the insurance, whether great or small, that the sums advanced to her or for her benefit as a preferred creditor would buy.   It was in effect her money that bought the insurance.

Even if we consider the whole amount realized, it is not sufficient in our opinion to raise any presumption of fraudulent intent or constructive fraud, when we look at the facts of this case and the character of the insurance.   Of the $100,000 realized $40,000 was from accident insurance. This is the simplest form of insurance, and the principles which control and apply to it are quite different from those controlling and applying to life insurance.   The latter is based upon the assured's expectancy of life, calculated upon his age, physical condition, etc., and matures upon the happening of an event which is certain, namely, the ultimate death of the assured.   In the former class of insurance the expectancy of life is not a controlling factor, nor is the age or physical condition of the assured.   Primarily, it is intended to indemnify the assured personally against loss of time, medical attendance, etc., in case of suffering accidental physical injuries, which incapacitate him from attending to his business.   In this respect it may be said to be in the interest of his creditors, because if disabled from carrying on his business his earning capacity is at least lost for a time, and his expenses while so disabled must of necessity come from his estate.   Such a policy fully matures only upon the happening of an event which may never take place, namely, the death from accidental causes of the assured.   In fact, the presumption is that the event will not occur.   The percentage of chances against it is very great; otherwise, companies could not furnish such insurance at the cheap rate they do. We are not prepared to say, therefore, that when a man in

the exercise of provident care sees fit to carry in addition to life insurance accident insurance to an amount, as in this case, of $40,000, that such an increased amount, even if by accident it should fully mature, renders the insurance carried unreasonable and excessive, and constructively a fraud upon the creditors, much less so when it appears that the annual premiums for the whole of the accident insurance did not exceed about $160. The assured was engaged in carrying on very extensive business operations, and his time was valuable. In case of accidental disability, his total weekly benefits would not have exceeded $200, and this was not unreasonable when the indemnity could be secured at the expenditure of such a small amount of money.

The last contention of plaintiff is that in any event the two policies issued by the New York Life Insurance Company were fraudulent and void as to the creditors of the assured, and were to be subjected to the payment of his debts because of certain provisions in the policies. The $15,000 policy provided among its conditions that if the assured was living at the expiration of twenty years from the date of its issuance, at which date the accumulation period of the policy was to end, he should have the privilege of continuing the policy and receiving the value of the dividends in one of certain forms specified, or to exchange the policy for its entire value, it being guaranteed that this entire value should be, in case the assured elected to receive it in a single cash payment, not less than $6,311, a sum which as will be seen is less than one half of the sum which would have been paid in case of his death at any time. The assured also had an option, at the expiration of this twenty-year period, to exchange the policy for a paid-up policy, payable after death in twenty equal installments. The $25,000 policy recited that it was issued on the distribution policy plan, the particulars of which, so far as material to notice, are that the distribution period should be completed in twenty years, and that no dividend or surplus would be allowed or paid upon the policy unless the assured should

survive the completion of this distribution period. If he did so survive such period, he would be entitled to apply the accumulated surplus apportioned to this policy to the purchase of an annuity on his life, or to continue the policy for the original amount and withdraw in cash the accumulated surplus apportioned to it, or to withdraw in cash the entire equity, that is, the net reserve, which was stipulated to be $9,820 ( a little more than one third of the amount payable in case of death), and in addition thereto the accumulated surplus, or to convert the entire equity into a paid-up policy. There are some material differences between the conditions of these policies and endowment policies as the latter are defined by the authorities, and these distinguishing features have an important bearing upon the doctrine laid down in the cases to which we have been cited by plaintiff in support of its position that these policies were fraudulent as to the creditors of the assured. In the view which we take of the case, however, it is not necessary for us to discuss these differences. If the doctrine which we have heretofore announced in this case is correct, then the contention of plaintiff as to these policies is equally untenable. In no event, it may be said at the outset, could the plaintiff claim a right against any part of the proceeds arising from the $25,000 policy, unless it be the amount of the premiums paid during the years 1893 and 1894, because it was taken out and premiums paid for a number of years prior to the time when there is any pretense of the insolvency of the assured, and because it matured long prior to the expiration of the twenty-year period. However this may be, in both cases the title to the policies vested in the beneficiary, Mrs. Platt, so soon as they were issued, subject only to certain conditions which might divest her of that title after the expiration of twenty years. Until that period expired, her title was as absolute as if the insurance had been upon any other plan, and as if none of these conditions had been inserted. If the assured had survived the twenty-year period, the contention of plaintiff might have been urged

with some force.   As in other forms of insurance, the subject of this was the insurable interest of the wife in the life of her husband, the assured, for twenty years at least, and life insurance becomes none the less life insurance because it be taken for only a term of years, instead of for the duration of life.   These views are sustained, we think, upon principle and by the doctrines announced in *Life Ins. Co. v. Woods*, 11 Ind. App. 335, *Holmes v. Gilman*, 138 N. Y. 318, *Briggs v. McCullough*, 36 Cal. 542, Bliss on Life Insurance, § 6, and *Forrester v. Gill*, 11 Colo. App. 410.   However this may be, the money which the assured was owing to Mrs. Platt was far more than sufficient to pay all of the premiums upon these policies, and as we have before said, as between the parties it will be presumed that he intended to prefer her as a creditor.   This therefore was not a locking up of the funds of the debtor so as to place them beyond the reach of his creditors, which was the main reason urged in the cases to which we have been cited as to the fraudulent character of the endowment policy.   It was giving the money to a creditor, as he had a right to do.

We are fully aware that the questions which we have decided are debatable, and for this reason we have given to them most earnest and thorough investigation.   We fail to find any adjudications directly in point, but we believe that our conclusions are in accord with the principles laid down in the later cases of highest authority, with the spirit of the law, with public policy, and especially with the policy of the law in Colorado.   It is true that *Bank v. Hume, supra,* is not an authority binding absolutely upon the courts of this state, but upon questions like these, which are not settled in this state either by statute or by prior adjudications, it is certainly very high authority, and we should hesitate before we refused to follow it, especially when, as in the present instance, the opinion was rendered by a unanimous court, and the doctrines enunciated are in accord with our own views.

For the reasons given, the judgment will be affirmed.

*Affirmed.*