**JOHN WEENINK & SONS CO. et, Appellants v. BLAHD et, Appellees.**

Ohio Appeals, Eighth District, Cuyahoga County.

No. 19022. Decided July 21, 1943.

58

Mr. Arthur P. Gustafson, Cleveland, for appellants.

Messrs. Squire, Sanders & Dempsey, Cleveland, for The Equitable Life Assurance Society of the United States.

Mr. Morton S. Zeller, Cleveland, and Mr. Morris I. Goldsmith, Cleveland, for appellees.

ROSS, P. J., HILDEBRANT and MATTHEWS, JJ., of the First Appellate District, sitting in the Eighth District by designation.

## OPINION

By ROSS, P. J.

This is an appeal on questions of law and fact from a decree of the Common Pleas Court of Cuyahoga county, in favor of the defendants.

The evidence is incorporated in an agreed statement of facts presented to this court, and certain exhibits.

The action in the trial court was initiated by the filing of what is commonly called a "creditor's bill," through which the proceeds of a certain policy of insurance, issued upon the life of Dr. Mose E. Blahd, are sought to be applied to the satisfaction of the judgment debt of the plaintiff.

A number of other judgment creditors filed intervening petitions seeking the same relief. The plaintiff and such intervening petitioners will hereafter be called "creditors".

In view of the form in which the evidence is presented to this court, it is deemed necessary only to state those facts which are considered pertinent to the conclusions of law reached herein.

Dr. Mose E. Blahd had, for many years prior to his death February 28th, 1940, been a successful practicing surgeon in the city of Cleveland, Ohio.

Approximately ten years before his death he suffered a severe impairment to his health, which had a direct effect upon the extent of his income, it thereby being reduced from

some twenty-five thousand dollars per annum to ten to fifteen thousand dollars per annum.

In the year 1930 the deceased was in serious financial difficulty, largely caused by the acquiring of a "palatial home," the cost of which exceeded his financial resources to the extent of some $20,000.00.

On November 30, 1930, the deceased and his wife, who was jointly obligated with him, entered into an agreement with their then creditors, by virtue of which certain persons were designated as trustees and according to the provisions of which the deceased and his wife were obligated to pay a monthly sum toward the liquidation of their debts. It was agreed by the debtors that such monthly payments should not be less than $750.00 per month.

During the period following the execution of this agreement and the death of the deceased some ten years later less than $3000.00 was paid by the debtors, upon their indebtedness. During this period the deceased received an income from his profession of an average of at least ten thousand dollars per year. He and his wife at the inception of this period were insolvent and continued to be insolvent until the date of the death of Dr. Blahd. Such fact must have been known to the creditors of the debtors if for no other reason than that the monthly payments were not made as agreed.

In 1935, the debtors extinguished their mortgage indebtedness upon the residence heretofore mentioned by deed to the first mortgagee. A second mortgage given to the creditors who signed the liquidation agreement was satisfied by the payment of $500.00 to the creditors' trustees by the first mortgagee upon surrender of such second mortgage to it.

In the agreed statement of facts is a tabulation showing the various policies of insurance issued upon the life of the deceased, and the premiums paid upon same during the period 1930-1940.

From this tabulation it appears that in this period, 1930-1940, the deceased paid or caused to be paid premiums amounting approximately to forty thousand dollars, which included the sum of approximately nineteen thousand dollars paid upon the policy directly involved in this controversy, or its predecessor, a term policy, which was converted in the year 1935 into a straight life policy. The proceeds of this latter policy amount to $45,283.81, and will be paid by The Equitable Life Assurance Society of the United States to the widow of the deceased, his joint debtor, in monthly payments under an

optional spendthrift agreement between the deceased and the insurer, and upon the selection by the widow, beneficiary, of an alternate provision for payment, unless the claims of the creditors are sustained.

In this connection, the deceased died temporarily a resident of Tucson, Arizona, to which city he and his wife had temporarily repaired, in order that an operation might be performed on deceased.

There can be no question but that both the deceased and his wife intended to return to their permanent residence in Cleveland, Ohio, although the widow has remained in Tucson, Arizona, since the death of her husband. The deceased left no estate, with the possible exception of $500.00, payable to his estate under a health and accident policy. Otherwise, the deceased and his widow were both insolvent at the time of his death. Disposing of the claim of the creditors as to this asset of the deceased, it is apparent that §9394 GC, has no application and furnishes no exemption, and that this asset is subject to the claims of creditors. **Baxter v The Old National-City Bank, 46 Oh Ap 533.** However, it is apparent also that such sum may not be reached except through process of a regular administration of the estate of deceased. No order is, therefore, made thereon.

It appears also from the agreed statement of facts that the premiums paid on the policy herein involved were received from four sources: **First.** directly from the income of the deceased; **second.** from policy loans and dividends upon policies; **third,** by drawings made by the secretary of the deceased upon a bank account held jointly by the deceased and such secretary; and, **fourth.** by contributions or loans made by others including the minor son of the deceased.

At no time did the deceased ever attempt to conceal his insolvency or the payments of premiums upon his insurance. It is reasonably inferable from the facts agreed upon that his creditors were continuously aware of his financial condition and such payments.

The deceased from time to time begged for forbearance from his creditors, in order that he might avoid taking advantage of the Bankruptcy Act.

It is noted that the deceased paid premiums upon a policy in which the creditors were beneficiaries, but which, the creditors not desiring to continue the payment of premiums, and the deceased claiming inability to do so, was allowed to lapse in 1938.

The deceased assigned a policy of $10,000.00 originally payable to his estate to Mildred S. Benjamin, his secretary. The maturity value of this policy was $4,195.30. The total premiums paid on this policy during the period 1930-1940 amounted to $2,997.18. This policy is not involved in the present action, except to the extent that evidence of the payment of premiums thereon is considered in connection with the total amount of premiums paid by the deceased. It appears from the policy of insurance herein involved that the insured had full control of this policy and by its provisions was permitted to assign or pledge it without the consent of the beneficiary. Such being the case, any loan secured by the insured upon the policy, upon payment, became a part of the assets of the insured, subject to his disposition as he saw fit, whether for the payment of premiums on insurance or the liquidation of other liabilities. **Kuhn et v Wolf, 59 Oh Ap 15.**

It can make no difference whether the sum borrowed is a large amount or merely enough to pay a premium.

The same principle applies to dividends, from the policy, paid deceased. These again became subject to the dominion and control of the deceased to the same extent as the fees of his profession.

Summarizing these facts, it appears that the annual income of deceased during the period 1930-1940 was some $10,000 per annum. That he paid for insurance during that period approximately $4,000 per annum. That during the same period he paid less than $3,000 upon his debts, and $500 of this amount was paid by the first mortgagee to the trustees of creditors. That he borrowed upon his insurance policies to the extent of $3,020.17, and received dividends, which he applied upon his insurance, of $745.50. That his secretary paid $1409.02, and others, lesser amounts.

Considering the amounts paid for insurance by the deceased during this period, and the sums paid by loans and dividends, there was an excess in income over disbursements of almost $7,000 per annum. If the deceased had paid only $2,000 per year toward the liquidation of his debts, they would have been extinguished at his death. It is obvious that the interests of his creditors had a most minor position in the mind of the deceased.

**Section 9394, GC, provides:.**

"All contracts of life or endowment insurance or annuities upon the life of any person, or any interest therein, which may

hereafter mature, and which have been or shall be taken out for the benefit of, or made payable, by change of beneficiary, transfer or assignment to, the wife or children, or any relative dependant upon such person, or any creditor, or to a trustee for the benefit of such wife, children, dependent relative or creditor, shall be held, together with the proceeds or avails of such contracts, subject to a change of beneficiary if desired, free and clear from all claims of the creditors of such insured person or annuitants; provided, that, subject to the statute of limitations, the amount of any premium upon said contracts, endowments or annuities paid in fraud of creditors, with interest thereon, shall inure to their benefit from the proceeds of the contracts, but the company issuing any such contract shall be discharged of all liability thereon by payment of its proceeds in accordance with its terms, unless, before such payment, written notice is given to it by a creditor, specifying the amount of his claim and the premiums which he alleges have been fraudulently paid."

Were it not for this section, the entire proceeds of the policy in question would be available to creditors, if the payment of the premiums which created this policy were paid in fraud of creditors. Lehman et v Gunn et, 124 Ala. 213. **Hoffman, etc. v Weiland, 64 Oh Ap 467, 470; Baxter v Old National-City Bank, 46 Oh Ap 533.** But this section creates both an exemption and and exception to such exemption. It provides that the proceeds of the policy shall be exempt from the claims of creditors **except** to the extent that premiums are paid in fraud of creditors, and that such premiums may be recovered where fraud has intervened. The statute therefore in fact creates an exemption merely of the excess over the amount of such premiums, where fraud has intervened.

It is obvious from a review of the authorities that there are two schools of thought applicable to such exemptions. The first exempts the entire proceeds of a policy, the premiums for which have been paid during a period of insolvency of the insured, if the amount of premiums so paid bears a reasonable relation to the financial condition of the insured. The other school of thought considers that where premiums are paid on insurance during the insolvency of the insured, that such payments, although made for the proper benefit of a wife, constitute constructive fraud of creditors, and the premiums if paid out of the income or assets of the insured may be recovered out of the proceeds of the policy

upon death of the insured. The divergence of conclusion upon such premises will be found in an annotation of the case of Ross v Insurance Co. (154 Minn. 186) in 31 A. L. R. 51.

The so-called "reasonable" rule is illustrated in the Ross case and also in Doethlaff v Penn Mut. Life Ins. Co. et, 117 Fed Rep (2d) 582.

The "constructive fraud" rule is found well stated in Bailey, Trustee v Wood et, 202 Mass 562, where a statute similar to our own is considered. Other Massachusetts cases follow the same conclusion. (See: 210 Mass. 35.)

The same rule is considered as controlling in Houston v Maddux, 179 Ill., 377; Lanning v Parker et, 84 N. J. Eq., 429; and Borg v McCroskery et, 120 N. J. Eq., 80.

Ohio many years ago took its place with those states which hold that fraud may be presumed when an insolvent insured diverts his assets to the payment of premiums of insurance, in favor at least of creditors who were such at the time the premiums sought to be recovered were paid. **Weber Loper & Co. v Paxton et, 48 Oh St 266,** p. 271 of the opinion, states:

"SPEAR, J. Do the facts bring the case within Section 3628 or within Section 3629, of the Revised Statutes? If within the latter section, is a case made which entitles the creditors to relief?

"We think the first question is answered by a reference to the face of the policy itself. Section 3628 applies where the insurance is effected by the person whose life is insured, for the benefit of his widow and children, or either. This policy, upon its face, appears to have been procured, not by the husband, but by the wife. The fact that the husband paid the premiums tends to indicate that the insurance was procured by him, but, standing alone, does not overcome the legal effect of the terms of the contract itself. There is an essential difference between a case where a husband contracts with an insurance company for insurance on his own life in consideration of premiums to be paid by himself, the loss to be payable to the wife, as in **Cross v Armstrong, 44 Oh St, 613,** and a case where the wife insures her interest in her husband's life, the premiums to be paid by her, as in **Manhattan Life Ins. Co. v Smith, same Volume, 156.** In the one case the policy is a chose in action which belongs to the husband, and which, beyond the limit fixed by Section 3628, he may not dispose of to the prejudice of creditors and those entitled to share in his personal

estate on distribution. In the other, although the premiums may have been paid by the husband, the contract is the wife's separate property, upon which the husband's creditors have no claim, unless it appear that the payment of premiums by him has had the effect to withdraw funds to which the creditors were entitled. As to creditors whose claims existed when such payments were made fraud might be presumed; as to subsequent creditors it would be necessary to show that there was fraudulent intent. Washington Central Bank v Hume, 128 U. S. 195."

This court in considering the application of §8618 GC, to a gratuitous conveyance by a mother to a daughter, although finding no actual intent to defraud creditors, found constructive fraud in such conveyance. Squire, Supt. of Banks v Cramer et, 64 Oh Ap 169. Sec. 8618 GC, uses the words "intent to defraud creditors." The cases cited in the opinon in Squire, etc. v Cramer et, supra, on page 172 of the opinion indicate that constructive fraud may be shown to comply with the requirements of a statute using the words "intent to defraud."

The facts in the instant case unquestionably justify a conclusion that the payments of the premiums by the deceased in the presence of his insolvency amounted to a constructive fraud of his creditors and the premiums paid by the deceased out of his income, with interest may be recovered by such creditors under and by virtue of the provisions of §9394 GC.

Even recognizing the "reasonable rule", the payment of almost fifty per cent of the income of the deceased for life insurance is an allocation of more than a reasonable portion of income for insurance of the wife of the deceased and others in the presence of insolvency.

It does not appear from the facts that a payment of some $4,000 per year for insurance can be justified as a reasonable provision for the wife of the insured and others under the circumstances in this case.

The creditors, therefore, are entitled to enforce their judgment claims against the premiums paid by the deceased insured whether such payments were made out of funds acquired by deceased from ordinary income, loans or dividends or gift to the insured.

As to the payments of premiums made by the secretary, it is recited in the agreed statement of facts:

"11. During the period beginning in 1930 and up to the time of his death, the said Mose E. Blahd in the course of his profession and business received and deposited many thousands of dollars in commercial accounts at various banks, upon which either he or the defendant Mildred S. Benjamin, employed by him as nurse and secretary, might draw. Notwithstanding the varied and many transactions which passed through these accounts, at no time during this period did the said Mose E. Blahd have sufficient funds upon hand with which to meet his obligations, but he remained continuously insolvent during said period and had full knowledge of his insolvent condition."

It is apparent from this statement that the secretary and the deceased did not maintain what is commonly known as a joint account, but rather merely that the secretary was given the right to draw on the funds of the deceased for convenience in paying the obligations of the deceased. Hence, such premiums so paid are amenable to the claims of creditors.

When payments of premiums were made by others than the deceased or his secretary directly to the insurer and did not become commingled with the fund of the deceased, such payments, including those made by the son of deceased, must be considered as gifts and not subject to the claims of the creditors.

One other question requires consideration. **Section 9394 GC**, used the expression "subject to the statute of limitations."

It is the claim of the defendants that these words refer to actions by the creditors to capture the fraudulently paid premiums and that the limitation runs from the time of payment of such premiums. In the first place, if such were the intention of the legislature, appropriate language could have been used to obtain this construction.

The natural, fair, and reasonable interpretation of the words, taking into consideration the frame of the section about them, is that the limitation referred to is that affecting the life of the claim of the creditor, the appropriate statute controlling, whether the debt be on open account, written contract, or judgment.

It is obvious from a reading of the statute—§9394, **GC**—that the right to recovery by creditors contemplated, is postponed until the maturity of the policy. The word "mature" is used in the statute and the subject-matter of the statute is

the "proceeds" of the policy. The fraud statute of limitations would therefore apply to the time elapsing after the maturity of the policy involved. The statute also provides that premiums fraudulently paid shall "inure" to the benefit of creditors. In addition to this if a creditor could forthwith attach a premium in the hands of the insurance company immediately upon its payment, the policy would automatically cease and be destroyed. Again, the insurer is discharged upon payment of the proceeds of the policy to the beneficiary (which would only occur after maturity thereof) unless notice is given of the creditors' claim and the premium claimed to have been fraudulently paid.

In **Lytle et v Baldinger et, 84 Oh St 1,** the Supreme Court indicated that the remedy of the creditor was under the provisions of §9394 GC.

The insertion of this reference to the statute of limitations in the section is manifestly proper, as otherwise, there might have been some slight basis for the contention that this section extended the claims of creditors otherwise barred by the various statutes of limitations. The legislature apparently desired to forestall such a claim, so that if at the time of the maturity of the policy the creditors' claim was barred by the statute of limitations, §9394 GC, would give him no additional right.

In the instant case, the creditors being judgment creditors the debts were all within the statute of limitations applying thereto and were not barred at the time the policy in question matured. The instant action was also brought within the period of time after maturity, prescribed in the statute of limitations applicable to fraud.

The construction contended for by defendants would cause a hardship upon the insured, which it is apparent the legislature in passing §9394 GC, intended to prevent. By the proper application of the statute, both the creditor and the beneficiary are proportionately protected. Any other construction would result in disadvantage to both.

One other contention of the defendants requires brief comment. It is claimed that because the widow-beneficiary-co-debtor with the deceased, insured, had elected to take advantage of the so-called "spendthrift" clause that the creditors can not reach the premiums paid in constructive fraud of their rights as such. This clause constituted an agreement between the insurer and the insured. It could be no more binding upon the creditors than the main provisions of

the policy, which provided that the **proceeds** thereof should be paid the beneficiary. The fact that these proceeds **could** be paid in installments can not affect the rights of creditors to the premiums.

The effect of the "spendthrift" clause in favor of defendants is sought to be sustained by the provisions of §9398-1 **GC**. It is sufficient to say that by definite provisions of §9398-2 **GC**, "The provisions of §9398-1 shall not impair or affect the rights of creditors under §9394 **GC**."

For these reasons, the creditors are entitled to recover to the extent hereinbefore indicated.

A decree may be entered by the local Court of Appeals, the appropriate amounts being determined according to this opinion.

HILDEBRANT and MATTHEWS, JJ., concur.